IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GWYNNE A. WILCOX,<br>    *Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States,<br><br> and<br><br>MARVIN E. KAPLAN, in his official capacity as Chairman of the National Labor Relations Board,<br>    *Defendants*. | Case No. 1:25-cv-00334-BAH<br><br>MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT |

## INTRODUCTION

President Trump's unprecedented removal of plaintiff Gwynne A. Wilcox from her position as a member of the National Labor Relations Board openly defies unambiguous language in the National Labor Relations Act, ninety years of established Supreme Court precedent, and more than a century of settled practice. Under the NLRA, the President may remove a member of the Board only "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a). And since *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court has repeatedly upheld Congress's power to impose just such limits on the President's authority to remove members of independent government agencies like the NLRB and the Federal Reserve Board.

Despite the law's clarity on this point, President Trump chose to remove Ms. Wilcox without purporting to identify any neglect of duty or malfeasance, and without providing notice and a hearing. Given an unambiguous statute and decades of binding Supreme Court precedent, it is not surprising that the President conceded that the removal violates the NLRA. The President

instead asserts that the NLRA unconstitutionally restricts his removal power under Article II. But that is the same argument that the Supreme Court rejected in *Humphrey's Executor* 90 years ago. And since then, Congress has repeatedly relied on the Court's decision by creating the NLRB and many other agencies modeled on the structure that the Court upheld.

Because the President's action was plainly illegal under existing law, the only path to victory for the President is to persuade the Supreme Court to overrule *Humphrey's Executor* and to adopt a new, more aggressive vision of presidential power that would effectively abolish independent agencies in the United States. But the Supreme Court, far from having done so, has instead "expressly declined to overrule" *Humphrey's Executor*. *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023). And it is not the role of this Court to do so here. Any such decision—which would create chaos in the federal government by upending ninety years of established precedent on which Congress structured dozens of federal agencies—must come, if at all, from the Supreme Court.

President Trump's removal of Ms. Wilcox not only unlawfully deprives her of her job; it also deprives the NLRB of a quorum, leaving it unable to fulfill its critical role in adjudicating labor disputes, thereby disrupting protections essential to workers, employers, and the broader public. Ms. Wilcox therefore seeks a declaration that her removal was unlawful and an injunction requiring her reinstatement so that the Board may resume its important congressionally mandated work. Because there is no dispute about the facts here—that the President removed Ms. Wilcox from the Board in violation of the NLRA's requirements—there is no barrier to proceeding straight to summary judgment. And given the inability of the NLRB to function without her, Ms. Wilcox respectfully requests that this Court expedite this motion and consider it on the same schedule as it would a motion for preliminary injunction.

**BACKGROUND**

**A.     Legal background**

Ninety years ago, Congress established the National Labor Relations Board as an independent federal agency charged with remedying the "inequality of bargaining power" between employers and employees "by encouraging … collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing." 29 U.S.C. § 151.[1] The Board's responsibilities include the exclusive jurisdiction to protect employees from unfair labor practices and to adjudicate labor disputes. *See id.* §§ 157–60. The Board adjudicates hundreds of unfair-labor-practice charges and disputes concerning workplace elections each year.

Congress created the Board as an independent, quasi-judicial body consisting of five members appointed by the President "with the advice and consent of the Senate" for staggered five-year terms. 29 U.S.C. § 153(a). One member, designated by the President, serves as the Board's Chair. *Id.* Congress expressly provided that the Board's members do not serve at the pleasure of the President but instead can be removed only for cause by providing that a "member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, *but for no other cause.*" *Id.* (emphasis added). Congress designed these protections to ensure the Board's status as an independent and impartial adjudicative body.

Congress's decision to structure the Board as an independent agency follows a well-established tradition, beginning nearly 150 years ago with the establishment of the Interstate Commerce Commission. *See* Interstate Commerce Act, Pub. L. No. 49-41, ch. 104, § 11, 24 Stat. 379, 383 (1887). Since then, Congress has created and fine-tuned the structures of dozens of additional

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

agencies, including the Federal Reserve Board, whose leaders are also removable only for cause. In *Humphrey's Executor v. United States*, the Supreme Court upheld the constitutionality of such statutory protections, holding that the President lacked authority to remove Commissioners of the Federal Trade Commission for reasons other than those specified by Congress. 295 U.S. 602 (1935). Congress has relied on that precedent for ninety years in structuring additional independent agencies, including the NLRB.

### B. Factual background

The Senate confirmed Ms. Wilcox as a member of the NLRB on September 6, 2023, for a second term of five years. SMF ¶ 2. In open disregard of the NLRA's for-cause removal provision, a letter sent by email to Ms. Wilcox on behalf of the President on January 27, 2025, informed her that she was "hereby removed from the office of Member[] of the National Labor Relations Board"—more than three years before her term was to expire. *Id.* ¶ 3. By reducing the NLRB to just two remaining members, the President's removal of Ms. Wilcox eliminated a quorum—effectively paralyzing the agency's operations. *See* 29 U.S.C. § 153(b) (providing that the Board requires at least three members for a quorum).

The President's decision to remove Ms. Wilcox is unprecedented. In the 90 years since passage of the NLRA in 1935, no President has previously attempted to remove a member of the Board. The President has not identified any neglect of duty or malfeasance by Ms. Wilcox to justify such an extreme action. SMF ¶ 4. Nor has he provided her with notice or a hearing. *Id.* ¶ 5. Instead, while acknowledging that "the National Labor Relations Act purports to limit removal of Board members to 'neglect of duty or malfeasance in office,'" his letter asserts that "this limitation is inconsistent with the vesting of the executive Power in the President." Wilcox Decl. Ex. A, at 1 n.1.

## ARGUMENT

I. **The NLRA's unambiguous language and 90 years of Supreme Court precedent establish that Ms. Wilcox was unlawfully removed as a member of the NLRB.**

**A.** The NLRA's plain language itself establishes that the President broke the law in removing Ms. Wilcox as a member of the NLRB. Section 153(a) provides that the President may remove a member of the Board only after "notice and hearing" and only "for neglect of duty or malfeasance in office, but for *no other cause*." 29 U.S.C. § 153(a) (emphasis added). That unambiguous language sets forth the *only* conditions under which Congress permitted the President to remove a sitting Board member.

The President's decision to remove Ms. Wilcox flouts those statutory criteria. Instead of identifying any "neglect of duty" or "malfeasance in office," the President asserted only a "lack [of] confidence that Commissioner[] Wilcox" would carry out the "objectives of [his] administration" without "unduly disfavoring the interests of employers." Wilcox Decl. Ex. A, at 1. The administration's "aims and purposes," the President claimed, could "be carried out most effectively with personnel of [his] own selection." *Id.* The "heads of agencies within the Executive Branch," the President asserted, "must share the objectives of [his] administration and its commitment to serving the will of the American people." *Id.*

The President has not claimed—nor could he—that these purported justifications show the "neglect of duty" or "malfeasance in office"—much less the "notice and hearing"—that the statute would require to legally remove Ms. Wilcox. *See id.* Instead, the President rested his removal decision entirely on the legal argument that *any* limitation on the President's authority to remove members is "inconsistent with the vesting of the executive Power in the President" in Article II. *Id.* at 1 n.1.

5

But the Supreme Court has repeatedly held that nothing in Article II prevents Congress from limiting the President's power to remove the heads of independent agencies like the NLRB and the Federal Reserve. Although Article II expressly specifies procedures for the President's "Appointments" of "Officers of the United States," U.S. Const. art. II, § 2, cl. 2, it contains "no express provision respecting removals" by the President. *Myers v. United States*, 272 U.S. 52, 109 (1926). Indeed, the Constitution's text is silent on the President's authority to remove executive officers. *See Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 258 (1839).

Although the Supreme Court has recognized that the Constitution grants the President an implied "general removal power," it has never suggested that this implied removal power is absolute. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 215 (2020). On the contrary, the Court has repeatedly recognized Congress's authority to create statutory "exceptions to the President's unrestricted removal power." *Id.* at 198. As the Supreme Court has explained, "[t]he President's removal power" is rooted not in the Constitution's text, but in "history and precedent." *Id.* at 214. And here, the same history and precedent that give the President the power to remove the heads of independent regulatory agencies also establish that Congress can limit that authority.

**B.** Nearly 150 years of history demonstrate Congress's authority to impose limits like the NLRA provision at issue here. Limits on the President's power to remove heads of multi-member regulatory agencies have existed as long as the agencies themselves. Beginning with the Interstate Commerce Commission in 1887, Congress has repeatedly allocated specified responsibilities to multi-member agencies whose principal officers could be removed only "for inefficiency, neglect of duty, or malfeasance in office." Interstate Commerce Act, ch. 104, § 11. Likewise, when Congress established the Federal Reserve Board in 1913, it provided that Board members may only be "removed for cause." Federal Reserve Act, Pub. L. No. 63-64, ch. 6, § 10, 38 Stat. 251, 260–61 (1913). And in creating the Federal Trade Commission in 1914, Congress specified that the agency's

6

members could be removed only "for inefficiency, neglect of duty, or malfeasance in office." Federal Trade Commission Act, Pub. L. No. 63-203, ch. 311, § 1, 38 Stat. 717, 717–18 (1914).

The Supreme Court has repeatedly upheld Congress's authority to impose such limits. Ninety years ago, the Court in *Humphrey's Executor* unanimously rejected the President's claim under Article II of an "illimitable power of removal" over all federal officers—the same claim that President Trump advances here. 295 U.S. at 626–28. The Court upheld Congress's power to require the President to show "inefficiency, neglect of duty, or malfeasance in office" to remove FTC Commissioners. *Id.* at 619. Congress's authority to create multi-member regulatory agencies like the FTC, the Court explained, "includes, as an appropriate incident, power to fix the period during which [its members] shall continue in office, and to forbid their removal except for cause in the meantime." *Id.* at 629. Since then, Congress has relied on *Humphrey's Executor* in creating numerous additional multi-member agencies headed by officers protected from at-will removal.[2] Congress has also afforded tenure protections to executive branch adjudicators, including the members of the Court of Appeals for the Armed Forces, 10 U.S.C. § 942(c), the Court of Appeals for Veterans Claims, 38 U.S.C. § 7253(f), the Court of Federal Claims, 28 U.S.C. §§ 171(a), 176(a), and the Tax Court, 26 U.S.C. § 7443(f).

---

[2] *See, e.g.*, 42 U.S.C. § 7412(r)(6)(B) (Chemical Safety and Hazard Investigation Board); 42 U.S.C. § 1975(e) (Commission on Civil Rights); 42 U.S.C. § 7171(b)(1) (Federal Energy Regulatory Commission); 5 U.S.C. § 7104(b) (Federal Labor Relations Authority); 46 U.S.C. § 46101(b)(5) (Federal Maritime Commission); 5 U.S.C. § 1202(d) (Merit Systems Protection Board); 30 U.S.C. § 823(b)(1) (Mine Safety and Heath Review Commission); 29 U.S.C. § 153(a) (National Labor Relations Board); 45 U.S.C. § 154 (National Mediation Board); 49 U.S.C. § 1111(c) (National Transportation Safety Board); 42 U.S.C. § 5841(e) (Nuclear Regulatory Commission); 29 U.S.C. § 661(b) (Occupational Safety and Health Review Commission); 39 U.S.C. § 502(a) (Postal Regulatory Commission); 49 U.S.C. § 1301(b)(3) (Surface Transportation Board); 39 U.S.C. § 202(a)(1) (United States Postal Service Board of Governors).

For nearly a century, *Humphrey's Executor* has served as a cornerstone of the Supreme Court's separation-of-powers jurisprudence, governing the structure of independent agencies like the NLRB. Rather than overruling the decision, the Court has repeatedly reaffirmed it, including in *Wiener v. United States*, where it unanimously rejected the President's claim of at-will removal authority over members of the War Claims Commission. 357 U.S. 349, 355–56 (1958). Likewise, a nearly unanimous Court upheld similar removal restrictions in *Morrison v. Olson*, 487 U.S. 654, 692 & n.31 (1988).

In short, this case presents a straightforward application of "[l]ong settled and established practice"—a consideration of "great weight in a proper interpretation of constitutional provisions." *Chiafalo v. Washington*, 591 U.S. 578, 592–93 (2020). "As James Madison wrote, 'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases.'" *Id.* at 593; *see also Mistretta v. United States*, 488 U.S. 361, 401 (1989). And that remains true "even when that practice began after the founding era." *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014). The Supreme Court has repeatedly emphasized that such "longstanding congressional practice reflects and reinforces [the] Court's precedents." *Moore v. United States*, 602 U.S. 572, 590 (2024).

**C.** To be sure, the Court in *Seila Law* "declined to extend" *Humphrey's Executor* to novel agency structures "with no foothold in history or tradition," such as those (like the CFPB) that are "run by a single individual." 591 U.S. at 204, 215, 222; *see also Free Enter. Fund v. PCOAB*, 561 U.S. 477, 483–84 (2010) (holding that Congress lacked authority to completely withdraw the President's general removal authority over an agency). In doing so, however, the Court expressly declined to "revisit [its] prior decisions allowing certain limitations on the President's removal power," including the limitations upheld in *Humphrey's Executor* itself. *Seila Law*, 591 U.S. at 204, 228. The Court has never questioned the continued application of *Humphrey's Executor* to "a traditional independent agency headed by a multi-member board or commission." *Seila Law*, 591 U.S. at 207.

8

Thus, as lower courts have recently recognized, binding Supreme Court precedent "still protects any *traditional* independent agency headed by a multi-member board." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 352 (5th Cir. 2024) (emphasis added).

This long and unbroken history leads to a simple constitutional rule: Congress may "create expert agencies led by a group of principal officers removable by the President only for good cause." *Seila Law*, 591 U.S. at 204 (citing *Humphrey's Executor*, 295 U.S. 602). The NLRB is just such an agency. Unlike the single-director CFPB, for which the Court struck down removal limits in *Seila Law*, the NLRB is governed by five members serving staggered terms, creating regular vacancies for the President to fill. *Compare* 29 U.S.C. § 153(a), *with Seila Law*, 591 U.S. at 225 (noting that "the agency's single-Director structure means the President will not have the opportunity to appoint any other leaders … who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies"). Indeed, the President removed Ms. Wilcox even though there were (and remain) two open seats on the Board for him to fill.

Moreover, the NLRA gives the President unrestricted authority to appoint the Board's Chair and General Counsel, creating additional opportunities to shape the agency's leadership and agenda. And the President has, in fact, exercised this authority. *See President Appoints Marvin E. Kaplan NLRB Chairman*, NLRB, https://perma.cc/63QJ-E9NY (Jan. 21, 2025); *President Trump Appoints William B. Cowen Acting General Counsel of the National Labor Relations Board*, NLRB, https://perma.cc/4AVA-NFTU (Feb. 3, 2025). Thus, while the NLRA protects the Board's ability to make independent, impartial decisions by limiting the removal of its members, it also provides the President multiple levers to bring the agency "in line with [his] preferred policies." *Seila Law*, 591 U.S. at 225.

These provisions put this case squarely at the heart of the rule adopted in *Humphrey's Executor*, which upheld virtually the same removal restrictions that Congress adopted in the NLRA

9

just two months later. Congress's reliance on *Humphrey's Executor* in shaping the Board's removal protections creates profound reliance interests. As the government itself has previously recognized, agencies protected by *Humphrey's Executor*'s framework "have become an accepted part of American government." Br. for United States, *Free Enter. Fund v. PCAOB*, No. 08-861, 2009 WL 3290435, at *43 n.16 (U.S. Oct. 13, 2009). Today, the decision underpins the constitutional legitimacy of agencies— including the Federal Reserve Board, the Federal Trade Commission, and the Federal Energy Regulatory Commission—that oversee countless aspects of federal administration, from ensuring the safety of nuclear power plants to setting interest rates. To depart from this long-settled precedent would subject every action taken by these agencies to potential constitutional challenge, threatening to upend vast swaths of the federal government. It is "hard to imagine a precedent whose overruling could more radically upend existing institutions." Daniel B. Rice & Jack Boeglin, *Confining Cases to Their Facts*, 105 Va. L. Rev. 865, 917 (2019).

Because the President's removal of Ms. Wilcox without meeting the statute's removal criteria runs contrary to nearly a century of settled Supreme Court precedent, this Court should declare the removal unlawful.

## II.   Ms. Wilcox is also entitled to an injunction.

To show entitlement to a permanent injunction, a plaintiff must "demonstrate that: (1) [she] has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 250 (D.D.C. 2020). These factors are easily satisfied here.

*First*, assuming (for the reasons shown above) that Ms. Wilcox prevails on the merits of her claim, she has suffered an irreparable injury that will continue every day that this Court does not

order an injunction. As this Court has recognized, "unlawful removal from office by the President" as a governing member of an independent agency is an "evident" irreparable injury. *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). Here, Ms. Wilcox's removal from the Board is "irrevocably disruptive" for her. *Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C. 1993), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993). And because it leaves the agency without a quorum, it is unable "to fulfill its mandate." *Berry*, 1983 WL 538, at *5. The Board cannot "continue to operate with only two members," so Ms. Wilcox's removal leaves the agency unable to finally review alleged unfair labor practices. *New Process Steel, L.P. v. N.L.R.B.*, 560 U.S. 674, 680, 687 (2010) (explaining that the NLRA requires "three participating members at all times for the Board to act"). The "irreparable nature of this injury is evident by [this] obviously disruptive effect." *Berry*, 1983 WL 538, at *5.

*Second*, monetary damages would not give Ms. Wilcox full relief for this injury because the injury is more than just the loss of a salary; it is the loss of a "statutory right to function" in a position directly related to a federal agency's "ability to fulfill its mandate." *Id.* And it may soon be *entirely* beyond remedy. If the President nominates and the Senate confirms a new member to replace her, "neither a damages remedy nor a declaratory judgment would provide an adequate remedy" for Ms. Wilcox's lost time in office. *Mackie*, 809 F. Supp. at 147. With each passing day, then, Ms. Wilcox loses an irretrievable and irremediable legal entitlement.

*Third*, the balance of the equities and the public interest also weigh in Ms. Wilcox's favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that, in a motion for an injunction against the government, these two factors "merge"). On the one hand, the injunction that Ms. Wilcox seeks would "not work any hardship on the defendant[s]." *Berry*, 1983 WL 538, at *6. As shown, the President has no legal right to remove Ms. Wilcox from office. And the President could fulfill the goal cited in the removal letter—effectuating the objectives of his administration—by exercising

his appointment power and filling the two lawful vacancies on the Board that already existed. Removing Ms. Wilcox does not adjust the orientation of the Board's operations; it prevents the agency from carrying out its congressionally mandated duties at all. There is no public interest in disabling an agency created by Congress from fulfilling its statutory obligations.

On the other hand, the urgent public need for clarity about whether Ms. Wilcox was wrongfully removed demonstrates that the public interest "strongly favors" an injunction in this case. *Berry*, 1983 WL 538, at *6. One employer recently refused to abide by the results of a union election, claiming that the Board "lacks authority" to certify the election in light of Ms. Wilcox's removal. Caroline O'Donovan, *Whole Foods says Trump's actions make union win moot*, Wash. Post, Feb. 5, 2025, https://perma.cc/DT9Q-98SB. Absent relief from this Court, similar defiance of the Board's authority is sure to follow.

By depriving the Board of a quorum, the President's illegal removal causes immediate harm to the workers, employers, and broader public who depend on it to ensure "the friendly adjustment of industrial disputes," 29 U.S.C. § 151, and impairs the NLRA's primary purpose: "to stop and to prevent unfair labor practices," *UAW v. Russell*, 356 U.S. 634, 643 (1958). Last fiscal year, the Board adjudicated hundreds of cases. *Board Decisions Issued*, NLRB, https://perma.cc/A8TY-Y3XG. These decisions resolved not only local disputes but also set precedent for American workplaces. In recent months, for example, the Board decided unfair-labor-practice charges concerning employers who fired an employee for discussing her wages with co-workers, *RFO808*, 373 N.L.R.B. 60 (2024); who placed manure near a union picket site, *Regional Ready Mix, LLC & Brand X, LLC*, 373 N.L.R.B. 56 (2024); and who assaulted an employee who requested unpaid wages, *East Freight Logistics, LLC*, 373 N.L.R.B. 7 (2023). The Board also recently addressed unfair-labor-practice charges brought by employers against unions. *See, e.g., IAMAW, Dist. Lodge No. 160*, 373 N.L.R.B. 39 (2024); *N. Atl. States Reg'l Council of Carpenters*, 373 N.L.R.B. 27 (2024). Today, employers

are without that same support from the Board. Ms. Wilcox's firing undermines the Board's capacity to review even clear NLRA violations. That would be "irrevocably disruptive of the Board's function and [Ms. Wilcox's] legal responsibility for carrying it out, all to the damage of the public interest." *Mackie*, 809 F. Supp. at 146.

## CONCLUSION

This Court should grant Ms. Wilcox's motion for summary judgment on an expedited schedule and issue the requested declaratory and injunctive relief.

Dated: February 10, 2025

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta (D.C. Bar No. 495451)
Matthew W.H. Wessler (D.C. Bar No. 985241)
Gregory A. Beck (D.C. Bar No. 494479)
GUPTA WESSLER LLP
2001 K Street, NW
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett*
GUPTA WESSLER LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

* motion to appear *pro hac vice* forthcoming

*Attorneys for Plaintiff Gwynne A. Wilcox*