# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GWYNNE A. WILCOX,

                Plaintiff,

     v.

DONALD J. TRUMP, in his official
capacity as President of the United States,

and

MARVIN E. KAPLAN, in his official
capacity as the Chairman of the National
Labor Relations Board,

                Defendants.

Case No. 1:25-cv-00334-BAH

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S
## EXPEDITED MOTION FOR SUMMARY JUDGMENT

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
Margaret Hassel (DC Bar No. 90029057)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTEREST OF *AMICUS CURIAE* ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

ARGUMENT ............................................................................................................... 4

I.   Binding Precedent Affirms the Legitimacy of Multimember Independent
     Agencies Like the NLRB .................................................................................. 4

II.  Established Practice Confirms the Validity of Multimember Independent
     Agencies ........................................................................................................... 10

III. Constitutional Text and History Further Underscore the Legitimacy of
     Multimember Independent Agencies ................................................................ 14

CONCLUSION ............................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ........................................................................... 12

*Collins v. Yellen*,
    594 U.S. 220 (2021) ........................................................................... 5

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    91 F.4th 342 (5th Cir. 2024) ............................................................. 4

*Exela Enter. Sols., Inc. v. NLRB*,
    32 F.4th 436 (5th Cir. 2022) ............................................................. 8

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ........................................................... 3, 5, 13, 17

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) ............................................................ 7, 13, 17

*In re Hennen*,
    38 U.S. 230 (1839) ............................................................. 3, 15, 16

*Mallory v. Norfolk Southern Ry. Co.*,
    600 U.S. 122 (2023) ......................................................................... 4, 10

*Marbury v. Madison*,
    5 U.S. 137 (1803) .............................................................................. 17

*McAllister v. United States*,
    141 U.S. 174 (1891) .......................................................................... 17

*McPherson v. Blacker*,
    146 U.S. 1 (1892) .............................................................................. 12

*Meta Platforms, Inc. v. FTC*,
    No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024) ................... 10

*Mistretta v. United States*,
    488 U.S. 361 (1989) .......................................................................... 10, 14

*Morrison v. Olson*,
    487 U.S. 654 (1988) .......................................................................... 13

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................................ 15-17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................ 6

*Nat'l Sec. Archive v. Cent. Intel. Agency*,
    104 F.4th 267 (D.C. Cir. 2024) ............................................................. 4

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ................................................................................ 3, 11

*Parsons v. United States*,
    167 U.S. 324 (1897) ................................................................................ 17

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ................................................................................ 6

*The Pocket Veto Case*,
    279 U.S. 655 (1929) ................................................................................ 10

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ................................................................ 1-10, 12-14, 18

*Shurtleff v. United States*,
    189 U.S. 311 (1903) ................................................................................ 17

*Stuart v. Laird*,
    5 U.S. 299 (1803) .................................................................................... 14

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ................................................................................ 12

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ................................................................................ 11

*Va. Off. for Prot. & Advoc. v. Stewart*,
    563 U.S. 247 (2011) ................................................................................ 6

*Wiener v. United States*,
    357 U.S. 349 (1958) ................................................................................ 8, 13

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................... 10, 14

*Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ....................................................................... 3, 10

<u>Constitutional Provisions, Statutes, and Legislative Materials</u>

Act of July 27, 1789, ch. 4, 1 Stat. 28 ............................................. 16

Act of Feb. 25, 1863, ch. 58, 12 Stat. 665 ...................................... 16

Act of Mar. 2, 1889, ch. 382, 25 Stat. 855 ..................................... 11

Act of June 29, 1906, ch. 3591, 34 Stat. 584 .................................. 11

An Act to Create a Federal Trade Commission, ch. 311, 38 Stat. 717 (1914) ............. 13

An Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) ....................... 1, 7, 11

1 Annals of Cong. (1789) ................................................................. 16, 17

*Hearing on S. 195 Before the S. Comm. on Educ. & Lab.*, 74th Cong. 138 (1935) ...... 9, 10

National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) ......................... 7

12 U.S.C. § 241 ............................................................................. 9

15 U.S.C. § 41 .............................................................................. 7

29 U.S.C. § 153(a) ........................................................................ 8

29 U.S.C. § 153(d) ........................................................................ 8

29 U.S.C. § 175a(d) ....................................................................... 8

U.S. Const. art. 1, § 8, cl. 18 .......................................................... 15

U.S. Const. art. II, § 2 .................................................................. 15

U.S. Const. art. II, § 4 .................................................................. 15

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

War Claims Act of 1948, ch. 826, 62 Stat. 1240 ............................................................ 9

<u>Books, Articles, and Other Authorities</u>

Daniel D. Birk, *Interrogating the Historical Basis for A Unitary Executive*, 73 Stan. L.
Rev. 175 (2021) ............................................................................................................ 14

*The Board*, NLRB, https://www.nlrb.gov/about-nlrb/who-we-are/the-board (last visited
Feb. 13, 2025) ............................................................................................................... 8

Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation
of Independent Federal Agencies*, 52 Admin. L. Rev. 1111 (2000) ........................ 11, 12

Br. for Court-Appointed *Amicus Curiae*, *Seila Law LLC v. CFPB*, 591 U.S. 197
(No. 19-7) ..................................................................................................................... 7

Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*,
27 Colum. L. Rev. 353 (1927).................................................................................... 17

David P. Currie, *The Constitution in Congress: The First Congress and the Structure
of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161 (1995).................... 16

Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725 (1996) ............. 14

Danielle Kaye & Rebecca Davis O'Brien, *Trump Firings at Labor Board Paralyze
the Agency*, N.Y. Times (Jan. 28, 2025).................................................................... 8

Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021
(2006) ........................................................................................................................... 16

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911).......................... 15

Joseph Story, *Commentaries on the Constitution of the United States* (1833).............. 15

*The Federalist No. 39* (Clinton Rossiter ed., 1961)....................................................... 15

*The Federalist No. 77* (Clinton Rossiter ed., 1961)....................................................... 15

White House Historical Association, *When Was Electricity First Installed at the White
House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-
installed-in-the-white-house ......................................................................................... 1

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works to improve understanding of the Constitution and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress has been creating multimember independent agencies like the National Labor Relations Board for most of the nation's history—they have existed for as long as the light bulb.[2] Nearly a century of Supreme Court precedent affirms their constitutionality.  Relying on that precedent, Congress has established dozens of multimember agencies wielding significant executive power whose leaders are removable only for cause.  Among the earliest was the NLRB itself, from which no Board Member has been removed in the agency's 90-year history. President Trump's attempt to remove Gwynne Wilcox from the Board without cause, in defiance of the National Labor Relations Act, contravenes binding Supreme Court precedent, established practice, and the Constitution's text and history.

In claiming authority to ignore the statutory requirements for removing NLRB Members, President Trump relies primarily on *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020).  But that decision addressed "a new situation" involving the "almost wholly unprecedented" creation of an independent agency led "by a single individual."  *Id.* at 238, 220, 213.  Making clear that it was

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission.  All parties have consented to the filing of this brief.

[2] *Compare* An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, § 11, 24 Stat. 379, 383 (1887) (establishing Interstate Commerce Commission), *with* White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house (electricity installed at White House and at State, War, and Navy Building in 1891).

not "revisit[ing] [its] prior decisions," the Court found "compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 204.

*Seila Law* distinguished single-director independent agencies from "a traditional independent agency, run by a multimember board," *id.* at 205-06, in three respects. First, the Court wrote, such agencies are "an innovation with no foothold in history or tradition." *Id.* at 222. Second, the Court concluded that a single-director structure is a greater imposition on presidential oversight, "foreclos[ing] certain indirect methods of Presidential control." *Id.* at 225. Third, the Court concluded that empowering a single director with "no colleagues to persuade" impermissibly "clashes with constitutional structure by concentrating power in a unilateral actor." *Id.* at 225, 204 (quotation marks omitted).

None of those features describes the NLRB—a prototypical multimember body that resembles agencies dating back 150 years in every constitutionally significant way. Bearing the hallmarks of a traditional independent agency, the NLRB has multiple members with staggered terms, avoiding the concentration of power that so troubled the Court in *Seila Law* while allowing every President to influence the Board's composition and policies. Indeed, Congress established the NLRB less than two months after *Humphrey's Executor* affirmed the legitimacy of this agency structure.

Even if *Seila Law* were not so definitive about what made the Consumer Financial Protection Bureau Director's removal protection unconstitutional, President Trump's argument that NLRB Members' removal protection "is inconsistent with the vesting of the executive Power in the President," Wilcox Removal Letter 1 n.1, ECF No. 175-2 ("Wilcox Removal Letter"), would still be foreclosed by established practice, which has long settled the constitutional legitimacy of multimember independent agencies like the NLRB.

In separation-of-powers cases, the judiciary places "significant weight upon historical practice," *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quotation marks omitted), including practice that "began after the founding era," because it embodies "the compromises and working arrangements that the elected branches of Government themselves have reached," *NLRB v. Noel Canning*, 573 U.S. 513, 525-26 (2014). Multimember independent agencies have wielded substantial executive power for generations. And the Supreme Court has consistently affirmed their constitutionality—right up to its recognition in *Seila Law* that Congress could amend the constitutional defects of the CFPB, "an independent agency that wields significant executive power," by "converting the CFPB into a multimember agency." 591 U.S. at 204, 237.

Multimember independent agencies like the NLRB are also fully consonant with the Constitution's original meaning. The constitutional text, which "is silent with respect to the power of removal," *In re Hennen*, 38 U.S. 230, 258 (1839), does not specify the exact boundary between the President's authority to supervise subordinates and Congress's authority to shape the federal government. The early consensus that Presidents have inherent removal authority was coupled with a recognition that Congress can limit this authority to some extent, which Congress began doing in the nineteenth century. And as the Supreme Court has consistently acknowledged, conditioning removal on good cause is a permissible limit for multimember expert bodies.

In *Seila Law*, as in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), the Supreme Court confronted a "new situation," *id.* at 483, and prohibited "*additional* restrictions on the President's removal authority" that have "no foothold in history or tradition," *Seila Law*, 591 U.S. at 228, 222 (emphasis added). It did not license lower courts to strike down a time-honored structure the Supreme Court has consistently upheld—that of a "traditional independent agency

headed by a multimember board or commission." *Id.* at 207. Instead, the court must abide by

the "directly control[ling]" precedent of *Humphrey's Executor*. *Mallory v. Norfolk S. Ry. Co.*,

600 U.S. 122, 136 (2023) (quotation marks omitted); *Nat'l Sec. Archive v. Cent. Intel. Agency*,

104 F.4th 267, 272 n.1 (D.C. Cir. 2024); *see also Consumers' Rsch. v. Consumer Prod. Safety

Comm'n*, 91 F.4th 342 (5th Cir. 2024), *cert. denied*, 2024 WL 4529808 (Oct. 21, 2024)

(declining to read *Seila Law* as overruling *Humphrey's Executor*).

## ARGUMENT

### I. Binding Precedent Affirms the Legitimacy of Multimember Independent Agencies Like the NLRB.

#### A. *Seila Law* Addressed Only the Innovation of an Independent Agency Led by a Single Director.

In claiming authority to remove Ms. Wilcox without cause, in violation of the NLRA,

President Trump relies on *Seila Law*. *See* Wilcox Removal Letter, *supra*, at 1 n.1. But *Seila

Law* was clear about its limited scope: "We hold that the CFPB's leadership *by a single

individual* removable only for inefficiency, neglect, or malfeasance violates the separation of

powers." 591 U.S. at 213 (emphasis added). "Instead of placing the agency under the leadership

of a board with multiple members," Congress "deviated from the structure of nearly every other

independent administrative agency in our history." *Id.* at 203. "The question before us," the

Court said, "is whether *this arrangement* violates the Constitution's separation of powers." *Id.*

(emphasis added).

As the Court explained, one of the longstanding exceptions to the President's inherent

removal authority, first recognized in *Humphrey's Executor*, permits Congress to "create expert

agencies led by a *group* of principal officers removable by the President only for good cause."

*Id.* at 204 (emphasis in original). In *Seila Law*, the Court was "asked to extend these precedents

to a new configuration: an independent agency that wields significant executive power *and is run by a single individual*." *Id.* (emphasis added).

In refusing to broaden its precedent, the Court was clear that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power." *Id.* Rather, the Court declined "to extend those precedents to the 'new situation' before [it]," *id.* at 220 (quoting *Free Enter. Fund*, 561 U.S. at 483), which introduced a "novel impediment" to presidential authority, *id.* at 215; *accord Free Enter. Fund*, 561 U.S. at 483-84 (striking down "new situation" of "multilevel protection from removal," but declining "to reexamine any . . . precedents"). In short, *Seila Law* was clear that it reached only the new phenomenon of removal protections for "principal officers who, *acting alone*, wield significant executive power." 591 U.S. at 238 (emphasis added).

The Court's subsequent decision in *Collins v. Yellen* confirmed the narrow scope of *Seila Law*'s holding. In that challenge to the single-director Federal Housing Finance Agency, the Court concluded that "[a] straightforward application of our reasoning in *Seila Law* dictates the result." 594 U.S. 220, 251 (2021). That straightforward application was simple: "The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd Frank Act) restricts the President's removal power." *Id.* *Collins* also rejected an argument that the validity of removal limits turns on "the nature and breadth of an agency's authority." *Id.*; *cf.* Wilcox Removal Letter, *supra*, at 1 n.1 (arguing that *Humphrey's Executor* does not apply because the NLRB wields "core" executive powers). And the Court reiterated that in *Seila Law*, "[w]e did not revisit our prior decisions allowing certain limitations on the President's removal power, but we found compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." 591 U.S. at 250-51 (quotation marks omitted).

5

**B.** ***Seila Law* Rested on Three Features Unique to Single-Director Independent Agencies, None of Which Characterize the NLRB.**

After concluding that precedent did not resolve the legitimacy of removal protection for agency leaders serving alone, *Seila Law* discussed three aspects of single-director leadership that the Court concluded made removal limits untenable in that context: it was a historical anomaly, 591 U.S. at 220-23; it introduced new barriers to presidential oversight, *id.* at 204; and it concentrated power in the hands of one person, *id.* None of those concerns applies to the NLRB.

### 1. *Historical Anomaly*

*Seila Law* stressed that "[t]he CFPB's single-Director structure is an innovation with no foothold in history or tradition" that was "almost wholly unprecedented." *Id.* at 220-22. In "only a handful of isolated incidents" had Congress elsewhere "provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission." *Id.* at 220 (quotation marks omitted). And nearly all of those "isolated examples" were also "comparatively recent and controversial." *Id.* at 221. This "lack of historical precedent" for the Bureau's single-director structure suggested a "constitutional problem." *Id.* at 220 (quotation marks omitted).

*Seila Law* was not the first time the Court articulated a suspicion of novelty. "Lack of historical precedent can indicate a constitutional infirmity," the Court has written, because novelty "is often the consequence of past constitutional doubts." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 260 (2011). The modern Court has applied this skepticism toward "novel governmental structures," *Seila Law*, 591 U.S. at 231, across multiple contexts. *See NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (while "not necessarily fatal . . . sometimes the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent" (quotation marks omitted)); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) (Congress's

"prolonged reticence" to assert authority creates an "inference" that it is "constitutionally proscribed").

But multimember independent agencies are not novel. Members of expert boards have enjoyed removal protection since the establishment of the Interstate Commerce Commission in 1887. *See* Act to Regulate Commerce, § 11, 24 Stat. at 383. And the NLRB bears the hallmarks of these traditional agencies. *Compare id.* (establishing the ICC with five Commissioners, serving six-year terms, removable for cause), *with* 15 U.S.C. § 41 (establishing the NLRB with five Members, serving five-year terms, removable for cause). Indeed, Congress created the NLRB less than two months after the Supreme Court upheld the model of an expert multimember body with removal protections. *Compare Humphrey's Ex'r*, 295 U.S. 602 (1935) (decided May 27, 1935), *with* National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) (signed July 5, 1935).

### 2. *Greater Encroachment on Presidential Oversight*

*Seila Law* also concluded that removal protections for agency heads who serve alone intrude on presidential authority more than protections for members of boards or commissions. This rendered the CFPB's structure a "novel impediment to the President's oversight of the Executive Branch." 591 U.S. at 215. Although the CFPB's defenders argued that a single-director independent agency is just as accountable to the President as a multimember agency, *see, e.g.*, Br. for Court-Appointed *Amicus Curiae* 44-46, *Seila Law*, 591 U.S. 197 (No. 19-7), the Court disagreed, holding that a single-director structure "forecloses certain indirect methods of Presidential control" available to influence multimember bodies. *Seila Law*, 591 U.S. at 225.

"Because the CFPB is headed by a single Director with a five-year term," a President could spend much of their term unable to remove a director holding diametrically opposed

views.  *Id.*  And "the agency's single-Director structure means the President will not have the opportunity to appoint any other leaders [of the agency] . . . who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.*  Indeed, "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities," because they will "*never*" be able to appoint a director.  *Id.*

None of these concerns apply to the NLRB.  With five Board Members serving staggered terms, regular vacancies allow every President to shape the agency's leadership and agenda.  *See* 29 U.S.C. § 153(a).  The President also appoints the Board's chairperson.  *Id.*  The NLRB receives funding through the annual appropriations process, *id.* § 175a(d), allowing Presidents to exercise control through their involvement in that process.  And the President has a further check on the NLRB because the President can remove the General Counsel at will, *see id.* § 153(d); *Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 441-42 (5th Cir. 2022), as President Trump has already done, *see* Danielle Kaye & Rebecca Davis O'Brien, *Trump Firings at Labor Board Paralyze the Agency*, N.Y. Times (Jan. 28, 2025), https://www.nytimes.com/2025/01/28/us/politics/trump-nlrb-jennifer-abruzzo.html.

President Trump objects that the NLRB is not "balanced along partisan lines."  Wilcox Removal Letter, *supra*, at 1 n.1.  But the President's ability to fill the NLRB exclusively with members of his own party will typically *augment* his power over the Board rather than diminish it.  Even without removing Ms. Wilcox, for instance, President Trump will be able to fill four of the Board's five positions with members of his own political party by next year.  *See The Board*, NLRB, https://www.nlrb.gov/about-nlrb/who-we-are/the-board (last visited Feb. 5, 2025).

Unsurprisingly, therefore, the Court has never mandated partisan balancing as an essential requirement of an independent agency.  *See Wiener v. United States*, 357 U.S. 349, 351

(1958) (upholding removal protections for the War Claims Commission, which had no partisan balancing requirement); War Claims Act of 1948, ch. 826, § 2(a), 62 Stat. 1240-41.  And indeed, the NLRB is not alone in allowing the President to set the partisan balance of its membership; other longstanding agencies, such as the Federal Reserve Board, afford the President the same control.  *See* 12 U.S.C. § 241.

In short, the NLRB's structure involves no "novel impediment to the President's oversight of the Executive Branch."  *Seila Law*, 591 U.S. at 215.

### 3. *Concentration of Power in a Single Person*

The third feature of the CFPB's structure on which *Seila Law* rested was its consolidation of power in "a unilateral actor insulated from Presidential control."  591 U.S. at 204.  According to the Court, this configuration has "no place in our constitutional structure."  *Id.* at 220.  With "the sole exception of the Presidency, that structure scrupulously avoids concentrating power in the hands of any single individual."  *Id.* at 222-23.  "The CFPB's single-Director structure," however, "contravene[d] this carefully calibrated system by vesting significant governmental power in the hands of a single individual."  *Id.*  "With no colleagues to persuade," this individual could "unilaterally" wield a range of enforcement, adjudicatory, and rulemaking authorities.  *Id.* at 225.

The Court found this arrangement a far cry from the "multimember body of experts" it previously had approved.  *Id.* at 216.  But the NLRB matches that traditional profile.  Modeled on the independent agencies that preceded it, the NLRB was structured with power divided among multiple Board Members.  *See Hearing on S. 195 Before the S. Comm. on Educ. & Lab.*, 74th Cong. 138 (1935) (statement of Sen. Robert La Follette) (discussing the benefits of having longer, staggered terms); *id.* at 64-65 (arguing that this feature would deter abrupt changes in

policy and make the Board more judicial in nature). Congress created this body of experts precisely because "[t]he law permitting self-organization and collective bargaining raises numerous problems, economic, social, and legal, which require expert knowledge and special training." *Id.* at 95 (statement of Francis Biddle, NLRB).

In contrast, the CFPB Director had no "peers" to share his authority or to temper his decisions, and the Court held that "*this arrangement* violates the Constitution's separation of powers." *Seila Law*, 591 U.S. at 203 (emphasis added).

\* \* \*

In sum, *Seila Law* held that the CFPB's unique structure could not find support in *Humphrey's Executor*. But the Supreme Court was explicit that "we do not revisit *Humphrey's Executor* or any other precedent." *Id.* at 228; *see Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at \*2 (D.C. Cir. Mar. 29, 2024) (per curiam) ("[t]he Supreme Court has not disturbed" *Humphrey's Executor*). And lower courts must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Mallory v. Norfolk Southern Ry. Co.*, 600 U.S. 122, 136 (2023) (quotation marks omitted).

## II.    Established Practice Confirms the Validity of Multimember Independent Agencies.

The flip side of the Supreme Court's suspicion of "novel governmental structures," *Seila Law*, 591 U.S. at 231, is that "'traditional ways of conducting government . . . give meaning' to the Constitution," *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). For that reason, the Court "put[s] significant weight upon historical practice" in separation-of-powers cases. *Zivotofsky*, 576 U.S. at 23 (quotation marks omitted); *see The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("established practice is a consideration of great weight" for such constitutional

provisions). When construing the Constitution's broadly phrased divisions among the branches, judges "must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached." *Noel Canning*, 573 U.S. at 526.

Established practice is crucial "even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Id.* at 525; *see id.* at 528-29 (relying on history of intra-session recess appointments that began after the Civil War); *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915) ("[I]n determining . . . the existence of a power, weight shall be given to the usage itself, even when the validity of the practice is the subject of investigation.").

Congress has been assigning regulatory authority to independent, multimember agencies for most of the nation's history, beginning nearly 150 years ago with the Interstate Commerce Commission. *See* Act to Regulate Commerce, § 11, 24 Stat. at 383. The ICC had investigative and enforcement authority over the monumentally important railroad industry, including the power to issue cease-and-desist orders, to require payment of reparations, and to enforce its orders in court. *See id.* §§ 12-16, 20; *cf.* Wilcox Removal Letter, *supra*, at 1 n.1 (emphasizing the NLRB's "core executive powers" to "award[] equitable relief in administrative adjudications" and to "pursue enforcement actions in federal court").

Although the Interior Secretary initially had some authority over the ICC, *see* Act to Regulate Commerce, §§ 18, 21, 24 Stat. at 386-87, Congress eliminated it two years later, *see* Act of Mar. 2, 1889, ch. 382, §§ 7-8, 25 Stat. 855, 861-62. And in 1906, Congress empowered the ICC to prescribe "fair" and "reasonable" practices, as well as maximum railroad rates, *see* Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 584, 589, cementing its status as "a very powerful agency," Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and*

*Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1130 (2000); *cf.* Wilcox Removal Letter, *supra*, at 1 n.1 (emphasizing the NLRB's power to "promulgate binding regulations").

In the early twentieth century, "a multitude of new agencies were established using the ICC as their prototype," including "the Federal Reserve Board (1913), Federal Trade Commission (1914), Federal Radio Commission (1927), Federal Power Commission (1930), Securities and Exchange Commission (1934), Federal Communications Commission (1934), National Labor Relations Board (1935), Bituminous Coal Commission (1935), and Federal Maritime Commission (1936)."  Breger & Edles, *supra*, at 1116 & n.14.  And the "critical element of independence" for these agencies is "protection . . . against removal except 'for cause.'"  *Id.* at 1138.

The long pedigree of multimember independent agencies is all but dispositive of their legitimacy.  "A legislative practice . . . marked by the movement of a steady stream for a century and a half of time" indicates "the presence of unassailable ground for the constitutionality of the practice."  *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 327-28 (1936); *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("where there is ambiguity or doubt" in constitutional interpretation, "subsequent practical construction is entitled to the greatest weight").

For generations, these agencies have wielded substantial executive power.  Although the Supreme Court initially conceived of their powers as "quasi-legislative or quasi-judicial," rather than as executive, *Seila Law*, 591 U.S. at 216 & n.2 (quotation marks omitted), it now recognizes that the functions which independent agencies have long carried out—enforcement, rulemaking, adjudications—are "exercises of . . . the 'executive Power'" under the Constitution, *City of Arlington v. FCC*,  569 U.S. 290, 304 n.4 (2013).  And at the time of *Humphrey's Executor*, the

12

FTC wielded considerable authority by any measure.  To accomplish its mission of preventing "unfair methods of competition," the agency could charge private parties with statutory violations, adjudicate those charges in administrative hearings, issue cease-and-desist orders, and enforce those orders in court.  *See Humphrey's Ex'r*, 295 U.S. at 871; *see also* An Act to Create a Federal Trade Commission, ch. 311, § 5, 38 Stat. 717, 719-20 (1914).

Beginning with *Humphrey's Executor*, therefore, the Court has consistently upheld removal protections for multimember agencies with powers that "at the present time" are "considered executive."  *Morrison v. Olson*, 487 U.S. 654, 699 n.28 (1988) (quotation marks omitted).  In *Wiener v. United States*, the Court confronted "a variant of the constitutional issue decided in *Humphrey's Executor*" and reached the same result.  357 U.S. at 351.  By the time of *Morrison*, it had been established for half a century that "the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies."  487 U.S. at 687 (quoting *Humphrey's Ex'r*, 295 U.S. at 630).

Two decades later, the Court again confirmed the validity of removal protections for multimember bodies wielding significant executive power.  Article II was satisfied when the members of the Public Company Accounting Oversight Board were shielded from removal by "a single level of good-cause tenure," making them adequately "subject . . . to Presidential oversight."  *Free Enter. Fund*, 561 U.S. at 509.

*Seila Law* again reinforced these principles.  Not only did the Court emphatically base its holding on the "new situation" of an independent officer wielding power "alone," but it explained that Congress could cure the constitutional defect while preserving removal limits by "converting the CFPB into a multimember agency."  591 U.S. at 237.

13

Thus, for nearly a century, an unbroken line of decisions has approved a governmental structure pioneered another half-century earlier.  Over the generations, Congress has relied on this precedent to create "some two-dozen multimember independent agencies" with for-cause removal protections.  *Id.* at 230.  This "practical exposition" of the Constitution is, by now, "too strong and obstinate to be shaken."  *Stuart v. Laird*, 5 U.S. 299, 309 (1803).

The NLRB is itself one of the canonical independent agencies upon which Congress has modeled others.  The agency has existed in essentially its current form since mere months after *Humphrey's Executor* was decided nearly 90 years ago.  It is not the CFPB (created in 2010; removal protection struck down ten years later based on its novel single-director structure) or the Public Company Accounting Oversight Board (created in 2002; removal protection struck down eight years later based on its novel dual layers of protection).  Striking down the NLRB's removal protections would discard nearly a century of history and interfere with what is now firmly established as a "traditional way[] of conducting government."  *Mistretta*, 488 U.S. at 401 (quoting *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring)).

## III.    Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies.

In addition to being validated by precedent and established practice, multimember independent agencies like the NLRB are fully consonant with the Constitution's original meaning, which supports Congress's authority to temper the President's exercise of removal authority.

At the Founding, there was no consensus that "executive" power entailed removal authority.  *See* Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725, 1790 (1996).  Removal authority was not "an inherent attribute of the 'executive power' as it was understood in England."  Daniel D. Birk, *Interrogating the Historical Basis for A Unitary*

*Executive*, 73 Stan. L. Rev. 175, 182 (2021).  And in Founding-era state governments, removal

authority was typically "lodged in the Legislatures or in the courts."  *Myers*, 272 U.S. at 118.

The Constitution itself "is silent with respect to the power of removal," *Hennen*, 38 U.S.

at 258; *see* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531 (1833)

("the Constitution makes no mention of any power of removal by the executive of any officers

whatsoever"), apart from Congress's power to impeach, U.S. Const. art. II, § 4.  Presidential

removal authority was not discussed at the Constitutional Convention, and Alexander Hamilton

soon after asserted that the Senate's consent would be required.  *See The Federalist No. 77*, at

459 (Clinton Rossiter ed., 1961).

Notably, the Framers rejected a plan to delineate in the Constitution the duties of specific

department heads who would serve "during pleasure."  2 *Records of the Federal Convention of

1787*, at 335-36 (Max Farrand ed., 1911).  Instead, the text broadly empowers Congress to shape

the federal government.  It anticipates that Congress would "by Law" create "Departments" and

"Officers," U.S. Const. art. II, § 2, while specifying little about their relationship to the President.

*Cf. id*. art. II, § 2, cl. 1 (authorizing the President to require the opinions of principal officers).

The Constitution also empowers Congress to enact laws necessary and proper "for carrying into

Execution . . . *all . . . Powers* vested by this Constitution in the Government of the United

States."  U.S. Const. art. I, § 8, cl. 18 (emphasis added).  James Madison explained that "[t]he

tenure of the ministerial offices generally will be a subject of legal regulation."  *The Federalist

No. 39*, *supra*, at 242.

Because of the Constitution's silence on removal, the question came to the fore when

Congress created the federal government's first departments.  But the ensuing "Decision of

1789" addressed only who, if anyone, possesses inherent removal power—not the extent to which Congress may condition that power.

The "real point which was considered and decided" in 1789 was whether the Senate's role in approving appointments also gave it "part of the removing power." *Myers v. United States*, 272 U.S. 52, 119 (1926); *see Hennen*, 38 U.S. at 259. As Congress considered legislation establishing a Foreign Affairs Secretary, disagreement arose about whether to declare that the President could remove the Secretary from office. *See* David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161, 196-201 (1995). Reflecting the absence of authoritative constitutional text, views differed about whether the Constitution gave inherent removal power to the President, the Senate, both jointly, or neither. *Id.*; *see Hennen*, 38 U.S. at 233. The final legislation obliquely signaled that the President could remove the Secretary, without specifying whether this power was statutory or constitutional. *See* Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29.

Despite its ambiguities, the Decision of 1789 was taken as establishing that "the constitution vested the power of removal in the President alone," rather than jointly with the Senate. 1 Annals of Cong. 398 (Rep. Vining) (1789). But the degree to which Congress could limit the President's inherent removal authority was not addressed, because the debate focused on where the removal power was lodged, not on Congress's authority to modify or abridge it. Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1072 (2006). Accordingly, when Congress later established a Comptroller within the Treasury Department, Madison noted "strong reasons why an officer of this kind should not hold his office at the pleasure of the executive," given that the Comptroller's duties partook "of a judiciary quality as

well as executive."  1 Annals of Cong. 636 (1789).  The "nature of this office" meant that "a modification might take place."  *Id.* at 638.

In the following decades, inherent presidential removal authority was viewed as compatible with legislative modification.  *Marbury v. Madison* concluded that Congress could make certain officers "not removable at the will of the executive," in which case "the appointment is not revocable, and cannot be annulled."  5 U.S. 137, 162 (1803).  Removal authority "was not regarded . . . as embracing officers with fixed term[s]," except perhaps for certain officers who implemented inherent presidential authority.  Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 379 (1927).

In the second half of the nineteenth century, Congress began imposing limits on presidential removal, ranging from good-cause tenure to a requirement of Senate concurrence in the removal.  *E.g.*, Act of Feb. 25, 1863, ch. 58, § 1, 12 Stat. 665, 665-66.  When disputes arose about these provisions, the Supreme Court resolved them as statutory matters, *e.g.*, *McAllister v. United States*, 141 U.S. 174 (1891); *Shurtleff v. United States*, 189 U.S. 311 (1903), declining to resolve "the constitutional power of the president in his discretion to remove officials during the[ir] term[s]," *Parsons v. United States*, 167 U.S. 324, 334 (1897).

Not until *Myers* did the Court establish the President's constitutional power of removal.  But that decision rejected a requirement of Senate approval that could inhibit removals entirely—making it "impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed."  272 U.S. at 164.  In contrast, a requirement of good cause to remove the leaders of multimember expert agencies was soon upheld as consistent with the President's constitutional authority.  *Humphrey's Ex'r*, 295 U.S. at 626.  That rule has prevailed ever since.  *See Free Enter. Fund*, 561 U.S. at 509 (curing

constitutional defect by subjecting multimember body to "a single level of good-cause tenure");
*Seila Law*, 591 U.S. at 237 (inviting Congress to preserve removal limits by "converting the CFPB into a multimember agency"). Constitutional text and history, therefore, do not support President Trump's assertion that good-cause tenure for NLRB Members violates his Article II authority.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion for summary judgment.

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

</div>

Dated: February 14, 2025