**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GWYNNE A. WILCOX, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Civil Action No. 1:25-CV-334 |
| v. | ) | Judge Beryl A. Howell |
| | ) | |
| DONALD J. TRUMP, in his official capacity, | ) | |
| et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

---

**BRIEF OF TENNESSEE AS AMICUS CURIAE STATE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR EXPEDITED SUMMARY JUDGMENT**

---

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae the State of Tennessee verifies that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE .......................................................................................... 1

INTRODUCTION ................................................................................................................... 3

ARGUMENT .......................................................................................................................... 4

    I.   Article II's vesting of the "executive Power" in a single, elected president requires plenary supervision of subordinate executive officials ...................................................... 4

    II.  For-cause removal protections for the Board and like agencies violate Article II. ............ 7

    III.  Shielding executive agencies from presidential supervision harms the States. ................ 11

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bond v. United States*,
   564 U.S. 211 (2011)................................................................................................1

*Chamber of Com. of U.S. v. NLRB*,
   723 F. Supp. 3d 498 (E.D. Tex. 2024).................................................................13

*City of Arlington v. FCC*,
   569 U.S. 290 (2013).......................................................................................2, 5, 8, 9

*Cochran v. SEC*,
   20 F.4th 194 (5th Cir. 2021) ................................................................................1

*Collins v. Yellen*,
   594 U.S. 220 (2021)...................................................................................3, 9, 10, 11

*DeCanas v. Bica*,
   424 U.S. 351 (1976)..............................................................................................13

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)..........................................................................6, 7, 8, 12, 14

*Garcia v. San Antonio Metro. Transit Auth.*,
   469 U.S. 528 (1985)..............................................................................................1, 2

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)..............................................................................................11

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935).......................................................................1, 3, 7, 8, 9

*Jarkesy v. SEC*,
   34 F.4th 446 (5th Cir. 2022) ..............................................................................10

*Morrison v. Olson*,
   487 U.S. 654 (1988)..............................................................................................4, 7

*Myers v. United States*,
   272 U.S. 52 (1926)................................................................................................5, 6, 7

*NLRB v. Starbucks Corp.*,
   125 F.4th 78 (3d Cir. 2024) ................................................................................13

*PHH Corp. v. CFPB*,
  881 F.3d 75 (D.C. Cir. 2018) ...................................................................................11

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ...............................................................5, 6, 7, 8, 9, 10, 11

*Thomas More L. Ctr. v. Obama*,
  651 F.3d 529 (6th Cir. 2011) .....................................................................................1

*Thryv, Inc.*,
  372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022) .......................................13

*Trump v. Untied States*,
  603 U.S. 593 (2024) .............................................................................................6, 9

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021) ........................................................................................................5

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
  No. 1:24-cv-02577, 2024 WL 5056358 (D.D.C. Dec. 10, 2024) .............................5

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ................................................................................................12

*Whitman v. Am. Trucking Assocs.*,
  531 U.S. 457 (2001) ...................................................................................................5

**Constitutions, Statutes, and Regulations**

U.S. Const.
  art. I, § 1 ...............................................................................................................4, 5
  art. II ...........................................................................3, 4, 5, 7, 9, 11, 15
  art. II, § 1 ..............................................................................................................4, 5
  art. II, § 3 .................................................................................................................4
  art. III, § 1 ............................................................................................................4, 5
  art. III, § 3 ............................................................................................................4, 5

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* ..............................................7

National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ........................................10, 13
  § 153(a) ...............................................................................................1, 5, 10, 11
  § 155 .....................................................................................................................10

26 Stat. 826 (1891) .....................................................................................................5

29 C.F.R. § 103.40 (2024) .........................................................................................13

Tenn. Const. art. 11, § 19 ..........................................................................................13

Tenn. Code Ann. § 50-1-201 ...........................................................................13

**Other Authorities**

Local Rule 7(o)(1)................................................................................................1

Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism*,
    79 Tex. L. Rev. 1321, 1338-46 (2001) ...............................................11

Equal Employment Opportunity Commission, *Enforcement Guidance on
    Harassment in the Workplace* (Apr. 29, 2024),
    https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-
    workplace .............................................................................................13

Exec. Order No. 14168 (Jan. 20, 2025) ...........................................................14

*The Federalist* (Clinton Rossiter ed., 1961)
    No. 62...................................................................................................12
    No. 70.................................................................................................3, 4
    No. 78.............................................................................................4, 6, 8

2 Henry de Bracton, *On the Laws and Customs of England*
    (Samuel E. Thorne trans., 1977) ...........................................................6

Alex Seitz-Wald & Jo Yurcaba, *Trump Vows to 'Stop' Gender-Affirming Care for
    Minors if Re-elected President*, NBC News (Jan. 31, 2023, 3:27 PM),
    https://www.nbcnews.com/politics/2024-election/trump-vows-stop-gender-
    affirming-care-minors-re-elected-president-rcna68461...........................14

Michael W. McConnell, *The President Who Would Not Be King* (2020) .....................6

Saikrishna Prakash, *New Light on the Decision of 1789*,
    91 Cornell L. Rev. 1021 (2006)...........................................................6

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* (2008)..................6

## INTERESTS OF AMICUS CURIAE

The State of Tennessee files this amicus curiae brief under Local Rule 7(o)(1) in support of Defendants' opposition to Plaintiff's Motion for Expedited Summary Judgment.

The balance of powers between the States and the Federal Government "preserves the integrity, dignity, and residual sovereignty of the States," allowing States to "function as political entities in their own right." *Bond v. United States*, 564 U.S. 211, 221 (2011). And the "structure of the Federal Government itself," which "gave the States a role" in selecting both the Executive and Legislative branches, "was designed in large part to protect the States from overreaching by Congress." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550-51 (1985). The vertical and horizontal separation of powers is also "a critical guarantee of individual liberty." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part), *abrogated by NFIB v. Sebelius*, 567 U.S. 519 (2012).

Independent agencies, like the National Labor Relations Board, present an especially grave danger to the States and their citizens. As an independent agency, the Board is run by officers insulated from presidential removal except, "upon notice and hearing, for neglect of duty or malfeasance in office." 29 U.S.C. § 153(a). This is by design. Independent agencies emerged out of a desire to "ditch the Founders' tripartite system and their checks and balances for a 'more efficient separation of politics and administration.'" *Cochran v. SEC*, 20 F.4th 194, 218 (5th Cir. 2021) (Oldham, J., concurring) (quoting Ronald J. Pestritto, *Woodrow Wilson and the Roots of Modern Liberalism* 227 (2005)); *see id.* at 219-21. As the Supreme Court remarked of the Federal Trade Commission ("FTC"), Congress "inten[ded] to create a body of experts … which shall be independent of executive authority." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 625 (1935). Left out in the cold? States—which lack power to affect many independent agencies' actions

through the bicameral lawmaking process.  *Cf. Garcia*, 469 U.S. at 550-51.

The threat to States from independent agencies is not hypothetical.  Employment policy rests within States' traditional police-power oversight. Tennessee has chosen to exercise this power by enacting pro-growth business policies. Yet the Board claims power to target employers for enforcement via in-house agency proceedings that override core state prerogatives.  *See* Br. of Tenn. & Twenty Other States as Amici Curiae in Supp. of Pet'r, *Starbucks Corp. v. McKinney*, No. 23-367 (U.S. Feb. 28, 2024).  The Equal Employment Opportunity Commission, as another example, claims independent-agency status and has ignored a direct presidential instruction to rescind Title VII guidance that harms the States as employers.  *See* Pls.' Resp. to Notice of Executive Order and Unopposed Mot. to Vacate Hr'g, *Tennessee v. EEOC*, No. 3:24-cv-224-CEA-DCP (E.D. Tenn. Jan. 22, 2025).  In these ways and many others, a "headless fourth branch of government" has hamstrung States like Tennessee with regulations no democratically elected actor has adopted.  *City of Arlington v. FCC*, 569 U.S. 290, 314 (2013) (Roberts, C.J., dissenting) (citation omitted).  Continuing to thwart supervision by the President will ensure independent agencies' anti-democratic policies will continue to inflict harm on States' sovereign prerogatives.

## INTRODUCTION

The Framers' genius lies in their choice to separate the legislative, executive, and judicial powers and vest each in its own branch. Article II, for its part, vests the "executive Power" in a single, nationally elected president able to act with "energy" and "dispatch." *The Federalist* No. 70, at 424 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Part and parcel of the President's law-execution duty is the power to supervise those carrying out Article II's chain-of-command.

When Congress restricts the president's ability to dismiss agency heads, it thus violates Article II's vesting of the "executive Power" in the President alone. Yet for some time now, the 1935 decision in *Humphrey's Executor* has carved out an aberrant exception from the constitutional rule of presidential supervision. Whatever *Humphrey's* reasoning used to be worth, subsequent Supreme Court cases have repudiated it. Instead, the requirement of at-will removal applies "*whenever* an agency does important work" of the Executive Branch, regardless of its "size or role." *Collins v. Yellen*, 594 U.S. 220, 252 (2021) (emphasis added). That describes the Board to a T: It claims power to promulgate rules regulating employment and prosecute private parties through its own in-house adjudicative system and in courts. So whether because *Humphrey's* is wrong or just inapplicable, the Board's for-cause removal restrictions violate Article II. And because Plaintiff Wilcox must be terminable at will, her motion for summary judgment should fail.

States have a large stake in the independent-agency debate. The Supremacy Clause contemplated laws moving through bicameralism and presentment, thereby ensuring States have a voice in the federal lawmaking process. Yet in the world of independent agencies, neither bicameral lawmaking nor elections can check federal rules that whipsaw States each year. Tennessee, for its part, is experiencing here-and-now harm from that disconnect. More harm will follow if important Executive Branch policies remain shielded from presidents' purview.

3

## ARGUMENT

I. **Article II's vesting of the "executive Power" in a single, elected president requires plenary supervision of subordinate executive officials.**

A. Our system of government contemplates three powers held by federal officials. The legislative power "prescribes the rules" of the community. *The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The executive power is the "sword of the community." *Id.* And the judicial power, "declare[s] the sense of the law." *Id.* at 469. The Framers "viewed the principle of separation of" those powers as "the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

With that principle in mind, the Framers proposed, and "the People of the United States … ordain[ed] and establish[ed]," the U.S. Constitution's separation-of-powers framework. U.S. Const. pmbl. Article I vests "legislative Powers" in "a Congress of the United States." U.S. Const. art. I, § 1. Article III vests the "[t]he judicial Power" in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. And finally, Article II: "The executive Power shall be vested in a President of the United States." U.S. Const. art. II, § 1.

The Framers understood that "[e]nergy in the executive is a leading character in the definition of good government," while a "feeble executive" leads to "bad government." *The Federalist* No. 70, at 423 (Alexander Hamilton) (Clinton Rossiter ed., 1961). To satisfy the "necessity of an energetic executive," Article II blends "ingredients which constitute energy in the executive," namely, "unity; duration; an adequate provision for its support; and competent powers." *Id.* at 423-24. And to ensure accountability for executive action, the Constitution commands that the President "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

B.    While the executive power is vested in "a President," U.S. Const. art. II, § 1, as a practical matter "the President alone and unaided could not execute the laws." *Myers v. United States*, 272 U.S. 52, 117 (1926).  So the Constitution contemplates that the president will enjoy "the assistance of subordinates" selected through required appointment processes.  *Id.*  Such subordinate officials include the heads of administrative agencies, which, having no superior other than the President, are principal officers. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021).

The history of the executive power, the text of Article II, and the structure of the Constitution dictate the President's power to remove executive agency heads.  To start, agencies exercise executive power.  That follows from a process of elimination.  Agencies cannot exercise any legislative power because those powers are vested in Congress, U.S. Const. art. I, § 1, and Congress may not delegate those powers, *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001).  Agencies cannot exercise the judicial power because they are not the Supreme Court or inferior courts.  *Compare, e.g.*, 29 U.S.C. § 153(a) (establishing the National Labor Relations Board "as an agency of the United States") *with, e.g.*, 26 Stat. 826-30 (1891) (establishing "circuit courts of appeals").  Therefore, agency "activities" are "exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'" *City of Arlington*, 569 U.S. at 304 n.4 (quoting U.S. Const. art. II, § 1).  So agencies exercise executive power when they "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties."  *See Seila Law LLC v. CFPB*, 591 U.S. 197, 225 (2020)

For centuries of Anglo-American legal history, the executive power has included plenary authority to remove subordinate executive officials.  *See generally VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 1:24-cv-02577, 2024 WL 5056358, at *3-4 (D.D.C. Dec. 10, 2024) (collecting

historical examples).  Henry of Bracton, writing in 13th century England, noted that the king wielded "the sword" of the community.  2 Henry de Bracton, *On the Laws and Customs of England* 32 (Samuel E. Thorne trans., 1977), https://tinyurl.com/yc2xa8sy; *cf. The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The executive … holds the sword of the community.").  While "powerful persons" were a part of "the sword" and helped the "defence of the realm and the country," they were "under the king," and they could neither "question" nor "contravene" his "acts."  *Id.* at 32-33.  The English king's power over subordinates continued up to the American founding: "The king had the prerogative power to remove" executive officers "at will."  Michael W. McConnell, *The President Who Would Not Be King* 162 (2020).

That English tradition carried into the United States.  During the much-discussed Decision of 1789, the First Congress concluded the President enjoys a "preexisting removal power." Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1026 (2006); *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010).  And that power was not academic for the Founders, as President George Washington "plainly and willingly employed" the "removal power" to "administer the executive branch … in an orderly fashion."  Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* 42 (2008).

Historical practice surrounding presidential removal power aligns with Article II's plain language, which guarantees the "President's power to remove—and thus supervise—those who wield executive power on his behalf." *Seila Law*, 591 U.S. at 204; *see also Trump v. Untied States*, 603 U.S. 593, 620 (2024) ("[T]he Constitution vests the entirety of the executive power in the President.").  And plenary removal also addresses functional concerns.  After all, Executive Branch subordinates "act for [the President] under his direction in the execution of the laws." *Myers*, 272 U.S. at 117.  By "implication," the President's "power of removing" his subordinates "is essential

to the execution of the laws." *Id.* Otherwise, swaths of critical enforcement authority would operate insulated from "a clear and effective chain of command" headed by the President, on whom the public can "pass judgment." *Free Enter. Fund*, 561 U.S. at 498.

Surveying all this, the Supreme Court in *Myers* held that Article II "grants to the President" the power of "removal of executive officers." 272 U.S. at 163-64. *Myers*'s approximately six-dozen pages of analysis included "an exhaustive examination of the First Congress's determination in 1789, the views of the Framers and their contemporaries, historical practice, and [Supreme Court] precedents up until that point." *Seila Law*, 591 U.S. at 214. Writing for the Court, Chief Justice Taft reinforced the president's removal power as a pillar in our constitutional framework—to impede that power "might make impossible that unity and co-ordination in executive administration essential to effective action." *Myers*, 272 U.S. at 134.

## II.    For-cause removal protections for the Board and like agencies violate Article II.

*Myers*'s detailed analysis of the president's power to remove executive officials soon met motivated opposition in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). But that case was wrongly decided. And its reasoning does not extend to NLRB regardless.

A.    *Humphrey's* examined the Federal Trade Commission Act, which limited the President's removal of FTC commissioners to cases of "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 619. The *Humphrey's* Court considered a claim for back-pay from the estate of an FTC commissioner dismissed by President Franklin Roosevelt without indicating a statutory cause for the dismissal. *Id.* at 612-19. In about a dozen pages, the Supreme Court upheld the FTC's removal restrictions against a constitutional challenge.

The decision in *Humphrey's*—"considered by many at the time the product of an activist, anti-New Deal Court bent on reducing the power of President Franklin Roosevelt," *Morrison*, 487 U.S. at 724 (Scalia, J., dissenting)—has since been read to "permit[] Congress to give for-cause

removal protections to a multimember body of experts, balanced along partisan lines." *Seila Law*, 591 U.S. at 216. *Humphrey's* did not square that holding with Article II's Vesting or Take Care Clauses. Instead, it rested its reasoning on a belief that "the duties" of the commission at issue were "neither political nor executive, but predominantly quasi judicial and quasi legislative." *Humphrey's Ex'r*, 295 U.S. at 624. In so holding, the Court described the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute and in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628.

*Humphrey's* reasoning was wrong the day it was rendered. To "carry into effect legislative policies" and "perform other specified duties" is, by definition, to *execute* a law. As discussed above (*supra* Section I.A.) government power is either legislative, executive, or judicial. *See The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The legislative power is to prescribe rules; the executive power is to effectuate those rules. *See id.* And the Constitution exclusively vests each of those powers in Congress and the President, respectively. For the Court to state that the FTC's "duties" were not "executive" was to contradict our constitutional design. Executive agency officials wield the executive power, even when doing things that look like legislating and adjudicating. *See City of Arlington*, 569 U.S. at 304 n.4.

Given its flaws, it is no surprise that subsequent cases have narrowed *Humphrey's* nearly out of existence:

- *Free Enterprise Fund* exhaustively detailed Article II's design to permit agencies to be "fully accountable" to the President for their conduct. Applying that rule, the Court held that the Public Company Accounting Oversight Board's "dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." 561 U.S. at 492.

- *City of Arlington* acknowledged that *all* agency activities are exercises of the executive power—contra *Humphrey's* quasi-legislative, quasi-judicial conception of FTC. 569 U.S. at 304 n.4.

- *Seila Law* cabined *Humphrey's Executor* to allowing "for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and [are] said not to exercise any executive power." 591 U.S. at 216. *Seila Law* noted that, even under *Humphrey's Executor*, a multimember agency that "wield[s] substantial executive power" violates Article II. *Seila Law*, 591 U.S. at 218.

- In *Collins v. Yellen*, the Court held that the "Recovery Act's for-cause restriction on the President's removal authority violates the separation of powers." 594 U.S. at 250. The Recovery Act created the Federal Housing Finance Agency, "led by a single Director" removable "by the President 'for cause.'" *Id.* at 229 (citation omitted). The "FHFA clearly exercises executive power," so even "'modest restrictions' on the President's power to remove the head of an agency with a single top officer" violates the Constitution. *Id.* at 254, 256 (citation omitted). And that rule of at-will removal applies "whenever an agency does important work." *Id.* at 252.

Most recently, in last term's *Trump v. United States* decision, the Court noted that the "removal" of certain federal officers "implicates 'conclusive and preclusive' Presidential authority." 603 U.S. at 620-21. A President's exclusive power that "stem[s] … from the Constitution itself" is "conclusive and preclusive." *See id.* at 607 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 585; *id.* at 638 (Jackson, J., concurring)). That includes "the President's 'unrestricted power of removal' with respect to 'executive officers of the United States whom he has appointed.'" *Id.* at 609 (quoting *Myers*, 272 U.S. at 106). "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609. Therefore, *Trump* determined that Congress cannot regulate a President's removal of those officers by way of criminal sanction. *Id.* at 621.

Putting all this together, the Supreme Court's recent instruction leaves at most a 1930s-FTC-specific exception to the general rule of at-will presidential removal. For those modern-day agencies exercising executive power, Article II prohibits statutes that purport to limit the

President's ability to dismiss an agency head. *See, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 464 n.19 (5th Cir. 2022) (discussing the interaction between *City of Arlington* and *Seila Law*), *aff'd on other grounds* 603 U.S. 109 (2024).

B.      The Board is "an agency of the United States" which "consist[s] of five … members, appointed by the President by and with the advice and consent of the Senate." 29 U.S.C. § 153(a). If the Board exercises significant executive authority, then the Constitution requires its heads to be removable by the President at will.

There can be no serious debate that the Board exercises "quintessentially executive power." *Seila Law*, 591 U.S. at 199; *see also Collins*, 594 U.S. at 252-53. The Board can "prosecute any inquiry necessary to its functions." 29 U.S.C. § 155. It can "make, amend, and rescind … rules and regulations as may be necessary to carry out the provisions of" the National Labor Relations Act ("NLRA"). *Id.* § 156. It can "copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question." *Id.* § 161(1). It can "issue … subpoenas requiring the attendance and testimony of witnesses or the production of any evidence in such proceedings or investigation requested in [an] application." *Id.* It can "administer oaths and affirmations, examine witnesses, and receive evidence." *Id.* It can "prevent any person from engaging in unfair labor practice." *Id.* § 160(a). It has power to hold a "hearing" when "it is charged that any person has engaged in or is engaging in any [] unfair labor practice." *Id.* § 160(b). And it can "order" a violator "to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay." *Id.* § 160(c).

Yet despite those immense executive powers, the Board's governing statute provides that "[a]ny member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a). The Board's removal

restrictions are plainly unconstitutional under *Seila Law* and *Collins*.  So Article II empowered President Trump to terminate Plaintiff Wilcox without cause or recourse in the form she requests— *i.e.*, a court order supervising presidential personnel decisions.

At a minimum, as a matter of constitutional avoidance this Court should read the Board's for-cause restrictions to permit removal for policy disagreements.  *Cf. PHH Corp. v. CFPB*, 881 F.3d 75, 127 (D.C. Cir. 2018) (Griffith, J., concurring) (doing same for director of Consumer Financial Protection Bureau).  The President determined that Plaintiff Wilcox, as a Board member, "adopted a host of decisions that have improperly cabined employers' rights to speak on the subject of unionization" and "vastly exceeded the bounds" of the Board's statutory authority.  D.E. 10-4 at 2.  Those grounds—transgressing the First Amendment and the Board's statutory boundaries— could readily constitute "neglect of duty" and "malfeasance in office."  29 U.S.C. § 153(a); *see PHH Corp.*, 881 F.3d at 127, 131 (Griffith, J., concurring).  A holding along those lines would permit this Court to "forgo … the more vexing constitutional question" of whether *Humphrey's Executor* is consistent with Article II.  *PHH Corp.*, 881 F.3d at 127 (Griffth, J., concurring).

## III.    Shielding executive agencies from presidential supervision harms the States.

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty" that divides power "between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).  That careful vertical separation of powers was the product of hard-fought compromise among those seeking to protect States' prerogatives.  Independent agencies harm States' role in our federal system in ways Tennessee's experience highlights.

A.    Vesting executive officials with runaway power to pursue unsupervised law enforcement upsets the Framers' fundamental federal-state balance.  Originally, James Madison at the Constitutional Convention proposed an expansive congressional negative that would have "empowered Congress to set aside any state law that it judged to be 'improper.'"  Bradford R.

11

Clark, *Separation of Powers as a Safeguard of Federalism*, 79 Tex. L. Rev. 1321, 1338-46 (2001). Several States objected; ultimately, States voted down the congressional negative by a vote of 7 to 3. *Id.* at 1353. Later, the Convention approved what would become the Supremacy Clause.

As ratified, the Supremacy Clause sets out three categories of federal laws—namely, the Constitution, "the Laws of the United States," and treaties—that trump contrary state enactments or constitutions. Notably, this scheme aimed to protect States by requiring all state-trumping laws to pass through "finely wrought" approval procedures necessitating the States' participation (the Senate's equal state representation for laws and treaties, and direct votes by States for constitutional amendments). It is by design that "[n]o law or resolution can now be passed without … a majority of the States"; States thereby may foreclose "improper acts of legislation." *The Federalist* No. 62, at 378 (James Madison) (Clinton Rossiter ed., 1961).

Nowadays, though, "those in the Executive Branch" increasingly seek "to use pen-and-phone regulations as substitutes for laws passed by the people's representatives." *West Virginia v. EPA*, 597 U.S. 697, 752-53 (2022) (Gorsuch, J., concurring). The result reduces States' power to protect their interests through the Constitution's bicameral process of lawmaking. Instead, States must engage with Executive Branch officials through indirect legal or political channels. Though poor substitutes for the checks of the bicameral lawmaking process, States can at least hope that the president and others directly accountable to the President will be sensitive to the prospect of political "blame or [] punishment" by the States and their voters. *Free Enter. Fund*, 561 U.S. 498.

B.    Independent-agency heads sideline any input from the parties they regulate by exercising powers in a manner often immune from political pressures or electoral results.

12

The Board is case in point.  Over the past several years, the Board has routinely advanced legal theories that go well beyond the text of the NLRA. Take its recent final rule providing that businesses will be treated as "joint employers" when they have control, even if indirect and unexercised, over a single essential term of employment. *See* 29 C.F.R. § 103.40 (2024). That broad-sweep approach infringed the States' "broad authority under their police powers to regulate the employment relationship" within their borders.  *DeCanas v. Bica*, 424 U.S. 351, 356 (1976). And a court vacated the rule because of its illegality.  *Chamber of Com. of U.S. v. NLRB*, 723 F. Supp. 3d 498, 519 (E.D. Tex. 2024).  The Board also has sought to expand its remedial rights beyond traditional bounds by claiming power to recover "for all direct or foreseeable pecuniary harms" to employees, including everything from credit-card debt to out-of-pocket medical expenses. *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at \*9, \*15 (Dec. 13, 2022).  Again, that was unlawful.  *See NLRB v. Starbucks Corp.*, 125 F.4th 78, 94 (3d Cir. 2024) (Board's remedial order "exceeds the Board's authority under the NLRA").  The Board's continued power creep affects States like Tennessee, in particular, by supplanting "right to work" and other pro-growth policies[1] with restrictions that largely favor labor unions and related interest groups.

Other independent agencies have inflicted real-world harm on Tennessee, too.  In 2024, the Equal Employment Opportunity Commission promulgated a sweeping enforcement document under Title VII of the Civil Rights Act of 1964.  In it, the Commission directed that Title VII requires employers like Tennessee to adopt and police a series of unprecedented gender-identity mandates in the workplace ranging from restrooms and locker rooms to "preferred pronoun" usage. *See* Equal Employment Opportunity Commission, *Enforcement Guidance on Harassment in the*

---

[1] *See* Tenn. Code Ann. § 50-1-201; Tenn. Const. art. 11, § 19 (approved Nov. 8, 2022).

*Workplace* (Apr. 29, 2024), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace.

Tennessee, leading a coalition of States, challenged the Commission's enforcement document as unlawful; during his campaign, President Trump promised to end federal imposition of similar gender-identity requirements. *See, e.g.*, Alex Seitz-Wald & Jo Yurcaba, *Trump Vows to 'Stop' Gender-Affirming Care for Minors if Re-elected President*, NBC News (Jan. 31, 2023, 3:27 PM), https://www.nbcnews.com/politics/2024-election/trump-vows-stop-gender-affirming-care-minors-re-elected-president-rcna68461 ("He said he would also prohibit any federal agency from working to 'promote the concept of sex and gender transition at any age.'"). So upon assuming office, President Trump immediately directed, *inter alia*, the Commission to rescind the Title VII enforcement document as contrary to the proper reading of Title VII and administration policy. *See* Exec. Order No. 14168 § 7(c)(iv) (Jan. 20, 2025).[2] Yet through a public statement issued the next day, all three members of the Commission's 3-1 Democratic majority refused the presidential directive. *See* Jocelyn Samuels (@JSamuelsEEOC), X (Jan. 21, 2025, 3:33 PM), https://perma.cc/E7WT-HUCD. So the enforcement document remains binding.

The upshot of the Commission's claimed independence is stark. Tennessee must continue to labor under—and spend time and resources litigating against—a sweeping and controversial Executive Branch enforcement document the President himself has disavowed and ordered rescinded. "But where, in all this, is the role for oversight by an elected President?" *Free Enter. Fund*, 561 U.S. at 499. The answer, when it comes to independent agencies, is nowhere. And therein lies the problem.

---

[2] Available at https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

## CONCLUSION

For the foregoing reasons, this Court should hold that the Board's for-cause removal restrictions violate Article II of the U.S. Constitution, affirm that presidents maintain power to supervise Board members through at-will termination of their positions, and deny Plaintiff's "Motion for Expedited Summary Judgment," D.E. 10.

Dated: February 20, 2025

JONATHAN SKRMETTI
Tennessee Attorney General
& Reporter
*/s/ Whitney Hermandorfer*

WHITNEY HERMANDORFER (DC Bar #888314222)
  Director of Strategic Litigation
JOSEPH M. FIORILE*
  Strategic Litigation Unit Honors Fellow
Office of the Tennessee Attorney General
and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-3491
whitney.hermandorfer@ag.tn.gov
joseph.fiorile@ag.tn.gov

*Counsel for Amicus Curiae State of Tennessee*

*Active Government Status

15

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2025, I electronically filed this brief of Tennessee as amicus curiae with the Clerk of the Court for the U.S. District Court for the District of Columbia by using the CM/ECF system.  Such filing effectuates service under LCvR 5.4(d).  In addition, courtesy copies of the foregoing brief have been emailed to counsel of record for the parties in this case.

February 20, 2025                                    */s/ Whitney Hermandorfer*

WHITNEY HERMANDORFER (DC Bar #888314222)