IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GWYNNE A. WILCOX,<br>   *Plaintiff*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>  and<br><br>MARVIN E. KAPLAN, in his official capacity as Chairman of the National Labor Relations Board,<br>   *Defendants*. | Case No. 1:25-cv-00334-BAH<br><br>PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' CROSS-MOTION |

## INTRODUCTION

The government's argument on summary judgment leaves little for this Court to decide. The government doesn't dispute that the President removed Ms. Wilcox without identifying any "neglect of duty or malfeasance in office," and without providing "notice and a hearing," as the National Labor Relations Act requires. 29 U.S.C. § 153(a). Nor does it dispute that *Humphrey's Executor*—which upheld a virtually identical limit on the President's removal power—is "binding on this Court." Gov. Br. 8 n.2. Although the government makes a token effort to distinguish the NLRA's removal provision from the provision of the Federal Trade Commission Act upheld in *Humphrey's Executor*, there are no meaningful differences between the two. Indeed, Congress created the NLRB just months after *Humphrey's Executor* and modeled it closely on the provisions upheld there—just as it has done for dozens of agencies responsible for many of the government's critical functions.

Instead, the government asks this Court to overrule *Humphrey's Executor* by reimagining it, arguing that the President's removal power extends even to traditional multimember agencies

1

exercising "quasi-judicial" and "quasi-legislative" powers. The government's reading of *Humphrey's Executor* invites the Court to upend more than a century of history and tradition—effectively ending independent agencies like the Federal Reserve and the NLRB by subjecting their essential functions to the unchecked authority of the President. Even the FTC removal protections upheld in *Humphrey's Executor* itself, the government essentially concedes, would fail this novel test. Although the government is free to ultimately press its argument that *Humphrey's Executor* was "wrongly decided" to the Supreme Court, "it is [that] Court's prerogative alone to overrule one of its precedents." *United States v. Hatter*, 532 U.S. 557, 567 (2001). This Court need go no further to conclude that Ms. Wilcox prevails on the merits of her claims.

As to relief, the government does not question this Court's authority to grant Ms. Wilcox's request for a declaratory judgment that her removal was illegal. There is thus no dispute that—assuming Ms. Wilcox prevails on the merits—she is entitled to a final judgment in her favor issuing at least that relief. The government does dispute the Court's authority to issue an injunction requiring Ms. Wilcox's reinstatement, arguing that her loss of government employment is neither an irreparable injury nor harms the public interest. But as another judge of this Court held just last week in issuing a temporary restraining order against the President's removal of a multimember agency head without cause, both of these criteria for an injunction are satisfied where, as here, removal of a government employee is "nakedly illegal." *Harris v. Bessent*, No. 25-412, 2025 WL 521027, at *3, *6 (D.D.C. Feb. 18, 2025) (Contreras, J.).

This Court should therefore grant summary judgment to Ms. Wilcox and order both declaratory and injunctive relief. And because the NLRB is deprived of a quorum every day that Ms. Wilcox is not allowed to serve in her duly appointed position, we respectfully request that the Court do so on the same timeline as it would a motion for a preliminary injunction.

# ARGUMENT

**I.**   ***Humphrey's Executor* controls this case and establishes that Ms. Wilcox's removal was illegal.**

**A.** Beginning with *Humphrey's Executor* in 1935, the Supreme Court has consistently "held that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).[1] In the ninety years since *Humphrey's Executor* was decided, the Court has repeatedly applied it to uphold for-cause removal limits on a range of "traditional" "multimember board[s] or commission[s]," *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 207 (2020), that exercise "predominantly quasi judicial and quasi legislative" functions, *Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935).

The two cases on which the government relies, by contrast, struck down removal limits involving "novel" agencies created in the wake of the 2008 financial crisis, both of which were headed by a single director with significant executive powers. *Seila Law*, 591 U.S. at 204; *Collins v. Yellen*, 594 U.S. 220, 220, 253 (2021). In *Seila Law*, the Court invalidated removal limits for the director of the Consumer Financial Protection Bureau, which the Court described as an "almost wholly unprecedented" single-director agency "with no foothold in history or tradition." 591 U.S. at 220–22. Likewise, the Court's decision in *Collins*, which concerned the Federal Housing Finance Agency, was just a "straightforward application of" the Court's "reasoning in *Seila Law*" that Congress cannot limit removal for "an agency led by a single Director." 594 U.S. at 251; *see also Free Enter. Fund*, 561 at 496 (noting the agency's "novel structure").

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

The NLRB's structure, on the other hand, falls squarely within *Humphrey's Executor*'s heartland. Like other independent agencies whose removal provisions the Supreme Court has upheld, Congress designed the NLRB as "a traditional independent agency" "run by a multimember board." *Seila Law*, 591 U.S. at 206. Because the Board's members serve staggered terms, every president has the "opportunity to shape its leadership and thereby influence its activities." *Id.* at 225.

The government does not dispute this. Instead, it argues (at 6–7) that *Humphrey's Executor* does not apply to the NLRB because the agency "wields substantial executive power." The government points to the NLRB's authority to investigate and adjudicate disputes over unfair labor practices, to order remedies in those cases, and to enforce compliance with its orders. But none of those agency powers distinguish the NLRB from *Humphrey's Executor* or other Supreme Court decisions upholding removal protections for independent agencies. As the D.C. Circuit has explained, Congress gave the FTC "ample authority to investigate and, if deceptive practices are uncovered, to regulate [the parties'] ... practices." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001); *see Seila Law*, 591 U.S. at 286 n.10 (Kagan, J., concurring in part and dissenting in part) (describing the FTC's authority in 1935 as including the power to "run investigations, bring administrative charges, and conduct adjudications"); *see also, e.g.*, *Harris*, 2025 WL 521027, at *3 (rejecting the government's argument "that *Humphrey's Executor* does not apply" to the Merit Systems Protection Board because "it may issue orders to federal employees, adjudicate and take final action, and litigate on its own behalf").

At the time *Humphrey's Executor* was decided, the FTC had broad authority "to prevent persons, partnerships, or corporations … from using unfair methods of competition." *Humphrey's Executor*, 295 U.S. at 620. In furtherance of that authority, Congress gave the agency "wide powers

4

of investigation," *id.* at 621, including "various legal tools such as subpoenas, 15 U.S.C. § 49, and 'civil investigative demands,' *id.* § 57b-1(b)." *Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 72–73 (D.D.C. 2024); *see also, e.g.*, *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024), *cert. denied*, 2025 WL 76435 (Jan. 13, 2025) (upholding removal protections for the Consumer Product Safety Commission, which "has investigatory powers, as well as civil and criminal enforcement powers"). Congress likewise authorized the FTC to charge private parties with statutory violations, adjudicate those charges in administrative hearings, issue cease-and-desist orders, and enforce those orders in court. *See Humphrey's Executor*, 295 U.S. at 871; Federal Trade Commission Act, Pub. L. No. 63-203, ch. 311, § 5, 38 Stat. 717, 719–20 (1914); *see also, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 692 & n.31 (1988) (noting that the FTC and other independent agencies "exercise civil enforcement powers"); *SEC v. Blinder, Robinson, & Co.*, 855 F.2d 677, 682 (10th Cir. 1988) (noting that *Humphrey's Executor* "stands generally for the proposition that Congress can, without violating Article II, authorize an independent agency to bring civil law enforcement actions where the President's removal power was restricted"); *Fed. Election Comm'n v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (upholding the constitutionality of the Federal Election Commission's enforcement authority and power to order retrospective remedies).

The government also points to the NLRB's authority to issue "such rules and regulations as may be necessary to carry out the provisions of this Act." 29 U.S.C. § 156. But again, that doesn't distinguish this case from *Humphrey's Executor*. The Supreme Court has consistently upheld removal protections "for so-called 'independent regulatory agencies,' such as the Federal Trade Commission, the Interstate Commerce Commission, and the Consumer Product Safety Commission, which engage substantially in what has been called the 'quasi-legislative activity' of

5

rulemaking." *Morrison*, 487 U.S. at 724–25 (citations omitted). In *FEC v. NRA Political Victory Fund*, for example, the D.C. Circuit relied on *Humphrey's Executor* and *Morrison* to uphold the constitutionality of the Federal Election Commission, which is "patterned on the classic independent regulatory agency" and can both make rules and order retrospective remedies. 6 F.3d at 826.

Finally, the government argues (at 10) that the NLRB's removal protections are stricter than those upheld in *Humphrey's Executor* because they don't expressly allow removal for "inefficiency." But nothing in *Humphrey's Executor* or its progeny suggests that a removal limit's constitutionality hinges on the President's authority to remove for "inefficiency." To the contrary, courts including the Fifth Circuit have upheld provisions allowing removal "for neglect of duty or malfeasance in office but for no other cause"—precisely the same language that Congress adopted in the NLRA. *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 352 (5th Cir.), *cert. denied,* 145 S. Ct. 414 (2024) (holding that *Humphrey's Executor* authorizes this provision); *see also Leachco*, 103 F.4th at 751 (same).

**B.** With no reasonable basis for distinguishing *Humphrey's Executor*, the government attempts to undermine its holding, arguing that the Supreme Court's decision "rested on a fiction." Gov. Br. 9. Agencies that *Humphrey's Executor* characterized as "quasi-legislative" and "quasi-judicial," it explains, are today "considered 'executive,' at least to some degree." *Id.* (quoting *Morrison*, 487 U.S. at 689 n.28). The degree to which the NLRB's removal provision resembles the one upheld in *Humphrey's Executor* is thus, according to the government, "beside the point." *Id.* On the government's view, *all* federal agencies exercise at least "some degree" of executive power and are thus subject to the President's unrestricted removal authority. *See id.*

6

The Supreme Court in *Morrison*, however, rejected this precise argument, holding that *Humphrey's Executor* remained good law even though "the powers of the FTC … would at the present time be considered 'executive.'" 487 U.S. at 689 & n.28. As the Court explained, the terms "quasi-judicial" and "quasi-legislative" as used in *Humphrey's Executor* did not "define rigid categories of those officials who may or may not be removed at will by the President," but merely "describe the circumstances in which Congress might be more inclined" to grant an agency "a degree of independence from the Executive." *Id.* at 689, 691 n.30. The modern understanding of those terms thus has no bearing on the constitutionality of removal provisions. *See, e.g.*, *Leachco*, 103 F.4th at 762 (holding that "the exercise of some arguably 'executive' functions does not undermine the constitutionality of tenure protections for officers of an expert, non-partisan agency"). Indeed, far from being undermined, *Humphrey's Executor* has been reinforced by subsequent precedent like *Seila Law*—which not only limited *Humphrey's Executor*'s holding to the "new situation" of a single independent officer wielding power "alone," but stressed that Congress could cure the constitutional defect by "converting the CFPB into a multimember agency." 591 U.S. at 237.

If the government were correct that "changes in judicial doctrine had significantly undermined" *Humphrey's Executor*, the Supreme Court "itself would have overruled the case." *Hatter*, 532 U.S. at 567. But the Court has never done so. To the contrary, the Court in the ninety years since *Humphrey's Executor* has repeatedly applied it—and repeatedly declined to overrule its holding. *See, e.g.*, *Collins*, 594 U.S. at 251 (noting that *Seila Law* declined to "revisit" *Humphrey's Executor*); *Morrison*, 487 U.S. at 688 & n.25 (recognizing that *Humphrey's Executor* is still good law); *Free Enter. Fund*, 561 U.S. at 483 (declining to "reexamine" *Humphrey's Executor*); *Seila Law*, 591 U.S. at 198 (leaving *Humphrey's Executor*'s rule "in place"). Indeed, the

7

Supreme Court just last month denied certiorari in a challenge to *Humphrey's Executor* involving the Consumer Product Safety Commission's removal provision—a provision identical to the one at issue here. *See Leachco, Inc. v. Consumer Prod. Safety*, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025).

The Fifth Circuit in *Consumers' Research* recently rejected the same argument that the government raises here. The plaintiffs there argued, like the government here, that *Seila Law* "upended" the rule of *Humphrey's Executor* by holding "that for-cause removal *always* creates a separation-of-powers violation—at least if the agency at issue exercises substantial executive power (which nearly all agencies do)." 91 F.4th at 345–46. The Fifth Circuit, however, declined to "read *Seila Law* so broadly." *Id.* Even if one believes that the "logic of *Humphrey's* may have been overtaken," that court observed, "the decision has not been overruled—at least not yet." *Id.* "Until that happens, *Humphrey's* controls." *Id.* The government essentially acknowledges as much (at 8 n.2) when it states its intent to argue that *Humphrey's Executor* was "wrongly decided."

To adopt the government's sweeping argument in this case would thus mean invalidating for-cause removal protections for *every* independent agency, with potentially catastrophic consequences to the structure of the federal government. Not even the current administration seems comfortable with that result. In a recently issued executive order, the President adopted the same argument that the government advances here—that all executive branch personnel must be subject to "the President's ongoing supervision and control." Exec. Order No. 14,215, 90 Fed. Reg. 10447 (Feb. 18, 2025) ("Ensuring Accountability for All Agencies"). But without any explanation, the order carved out exceptions for "the Board of Governors of the Federal Reserve System" and "the Federal Open Market Committee in its conduct of monetary policy," *id.*—a tacit recognition of the danger that the government's legal position poses to the nation's economic stability.

8

II.     **Ms. Wilcox is entitled to both declaratory and injunctive relief.**

**A.** Ms. Wilcox's complaint and motion for summary judgment request both declaratory and injunctive relief. Although the government contests this Court's authority to issue an injunction, it says nothing about the Court's authority to issue a declaratory judgment. And it is right not to contest such relief—the Supreme Court has "long held" that federal courts "ha[ve] the authority to determine whether [the President] has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see also Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992). Assuming that Ms. Wilcox prevails on the merits, then, she is at least entitled to a judgment in her favor declaring that the President lacked authority to remove her from the NLRB.

**B.** As to injunctive relief, the government's primary argument (at 11) is that the federal judiciary lacks authority to order the President to "reappoint [] a principal executive officer." As the government later recognizes (at 13), however, Ms. Wilcox is neither asking the Court for an injunction against the President nor requesting the remedy of "reappointment." Indeed, her complaint expressly disclaims any request for that relief. *See* Compl. ¶ 22. Rather, she seeks only an injunction against Chairman Kaplan ordering him to "provid[e] her with access to government facilities and equipment, and to refrain from taking any further action to obstruct [her] ability to carry out her duties." *Id.* at 7.

The government responds (at 13) that the President, not Chairman Kaplan, is the "only official with the statutory and constitutional authority" to reappoint her to the NLRB. But if Ms. Wilcox prevails on the merits of her claims, it means that the President lacked the power to remove her in the first place. Thus, Ms. Wilcox does not need, and has not requested, the remedy of "re-appointment" by the President. The only remedy she seeks is one that would allow her to return to her duly appointed office and resume carrying out her duties. An injunction against Chairman Kaplan—who has the administrative authority to permit Ms. Wilcox to resume her role—is all she

9

needs to achieve that. *Swan v. Clinton*, 100 F.3d 973, 978–80 (D.C. Cir. 1996) (noting that, "in most cases" courts can issue such relief "against subordinate officials," obviating the need for relief against the President, and specifically recognizing that an injunction against the Chairman of the National Credit Union Administration would redress the plaintiff's allegedly unlawful removal from that agency).

**C.** Next, the government (at 13–14) challenges Ms. Wilcox's showing of the irreparable injury necessary to obtain an injunction, relying on *Sampson v. Murray* and other cases holding that loss of employment and salary and disputes over routine personnel issues "ordinarily do not amount to irreparable injury." *Sampson*, however, rested on the principle that "the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson v. Murray,* 415 U.S. 61, 83 (1974). As Judge Contreras recognized last week in *Harris*, that principle is inapplicable "in the context of an action," like this one, that "appears to be nakedly illegal." 2025 WL 521027, at *6. The President's blatant violation of an independent agency's statutory removal limits, *Harris* explained, is just the sort of "genuinely extraordinary situation" that *Samson* held "merit[s] injunctive relief for a discharged Government employee." *Id.*

Like the plaintiff in *Harris*—but unlike the probationary employee in *Sampson*—Ms. Wilcox was appointed and confirmed by the Senate to a leadership role in an independent federal agency. *See id.* And also like the plaintiff in *Harris*, that removal was made in violation of removal protections "made plain by federal statute and supported by ninety years of Supreme Court precedent." *Id*. Likewise, the Court in *Berry v. Reagan* found irreparable harm where, given statutory removal protections, it was "not clear that the President [had] the power to remove Commissioners at his discretion" or "should be given the widest latitude to exercise this authority." 1983 WL 538, at *5 (D.D.C. 1983). As the Court explained in *Harris*, this kind of blatantly illegal

removal "represent[s] far more than grievances over backpay and routine personnel issues." *Harris*, 2025 WL 521027, at *7.

Ms. Wilcox has also suffered irreparable harm here because the President's illegal removal "prevents her from carrying out the duties Congress has assigned to her." *Id.* at *8; *see also Berry*, 1983 WL 538, at *5 (finding irreparable harm from deprivation of the "statutory right to function" as a member of an independent agency); *Dellinger v. Bessent*, --- F. Supp. 3d at ----, No. 25-0385, 2025 WL 471022, at *11 (D.D.C. Feb. 12, 2025) (Jackson, J.) (finding irreparable harm from Special Counsel's inability to fulfill his "statutory mission" to protect employees from prohibited personnel practices). Ms. Wilcox's "loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief." *Dellinger*, --- F. Supp. 3d at ----, 2025 WL 471022, at *11. And because Ms. Wilcox's removal eliminated a quorum, it has the "obviously disruptive effect" of bringing an immediate and indefinite halt to the NLRB's critical work of adjudicating labor-relations disputes. *Berry*, 1983 WL 538, at *5. That injury, too, is irreparable. *See id.*

**D.** The government's final argument (at 15) is that the balance of equities cuts against Ms. Wilcox. "Because the NLRB is an executive agency exercising executive authority," it argues, "an injunction functionally reinstating one of its principal officers would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive." But that is true only if the government is correct that the President had the authority to remove Ms. Wilcox in the first place. The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

On the other side of the scale, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). So, too, is there substantial public interest in the protections from removal that Congress has given to certain members of independent agencies. Because "federal law limits the conditions under which [Ms. Wilcox's] tenure may be terminated, Supreme Court precedent supports the constitutionality of those conditions, and Defendants do not argue that those conditions were met here, … it is in the public interest to issue injunctive relief." *Harris*, 2025 WL 521027, at *9.

Moreover, as our opening brief explained (at 12–13), the NLRB's lack of a quorum leaves the agency unable to fulfill its critical role in certifying union elections and adjudicating labor disputes. Those effects are now playing out in real time, as evidenced by recent employer objections in cases involving Whole Foods and CVS. In both cases, despite a majority of workers voting in favor of union representation, the employers have argued that the NLRB's inability to certify election results due to its lack of a quorum prevents the unions from being formally recognized. *See* Whole Foods Market Group, Inc.'s Objections to Conduct Affecting the Results of Election, *Whole Foods Mkt. Grp., Inc. v. United Food and Commercial Workers Union Local 1776*, No. 04-RC-355267 (February 3, 2025), https://perma.cc/L3N8-2C2Q; Employer's Request for Review of Regional Director's Decision Overruling Objections and Certification of Representative, *CVS Health, Store #2065 v. Pharmacy Guild*, No. 01-RC-339980 (February 21, 2025), https://perma.cc/R5LC-8NM3. This delay not only stalls the collective bargaining process, but also creates uncertainty and potential leverage for employers to resist unionization efforts, undermining workers' rights under the National Labor Relations Act. The longer Ms. Wilcox is wrongfully kept from her position, the worse the situation will become for workers, employers,

and the broader public who depend on the agency's important congressionally mandated work. This severe public harm "strongly favors" an injunction in this case. *Berry*, 1983 WL 538, at *6.

## CONCLUSION

This Court should grant Ms. Wilcox's motion for summary judgment and award her both declaratory and injunctive relief. The Court should deny the government's cross-motion.

Dated: February 25, 2025

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta (D.C. Bar No. 495451)
Matthew W.H. Wessler (D.C. Bar No. 985241)
Gregory A. Beck (D.C. Bar No. 494479)
GUPTA WESSLER LLP
2001 K Street, NW
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett*
GUPTA WESSLER LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

* admitted *pro hac vice*

*Attorneys for Plaintiff Gwynne A. Wilcox*