**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

GWYNNE A. WILCOX,
       *Plaintiff,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; and

MARVIN E. KAPLAN, in his official
capacity as Chairman of the National
Labor Relations Board,

       *Defendants.*

Case No. 1:25-cv-00334-BAH

---

**BRIEF OF THE STATES OF MINNESOTA, ARIZONA, CALIFORNIA,
COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA,
HAWAI'I, ILLINOIS, MARYLAND, MASSACHUSETTS, MICHIGAN,
NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON,
RHODE ISLAND, VERMONT, AND WISCONSIN
*AS AMICI CURIAE* IN SUPPORT OF
PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT**

KEITH ELLISON
Attorney General
State of Minnesota

LIZ KRAMER
Solicitor General
ZACH BIESANZ*
Assistant Attorney General

Office of the Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Kramer)
(651) 757-1257 (Biesanz)
liz.kramer@ag.state.mn.us
zach.biesanz@ag.state.mn.us

*Admitted to the bar of this Court

(Additional Counsel Listed on Signature Page)

## TABLE OF CONTENTS

**Page**

**INTEREST OF AMICI CURIAE**................................................................................................1

**ARGUMENT** .............................................................................................................................2

    I.    LABOR UNIONS SUPPORT AMERICAN WORKERS AND THE ECONOMY. .......................2

    II.    STATES NEED AN EFFECTIVE NLRB TO REGULATE LABOR RELATIONS AND ADJUDICATE LABOR DISPUTES. ............................................................................4

    III.    INVALIDATING THE NLRA'S REMOVAL PROTECTION WOULD NEEDLESSLY DESTABILIZE LABOR LAW. .....................................................................................8

**CONCLUSION** .......................................................................................................................10

**TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Allentown Mack Sales & Service, Inc. v. N.L.R.B.*
  522 U.S. 359 (1998) .......................................................................................... 6

*Amalgamated Ass'n of St., Elec. Ry. And Motor Coach Emp. Of America v. Lockridge*
  403 U.S. 274 (1971) .......................................................................................... 5

*Chaulk Services, Inc. v. Massachusetts Comm'n Against Discrimination*
  70 F.3d 1361 (1st Cir. 1995) ......................................................................... 6, 7

*Colgate-Palmolive-Peet Co. v. N. L. R. B.*
  338 U.S. 355 (1949) .......................................................................................... 2

*Glacier Northwest, Inc. v. Int'l Brotherhood of Teamsters Local Union No. 174*
  598 U.S. 771 (2023) ....................................................................................... 5, 8

*Humphrey's Ex'r v. United States*
  295 U.S. 602 (1935) ...................................................................................... 9, 10

*New Process Steel, L.P. v. N.L.R.B.*
  560 U.S. 674 (2010) .......................................................................................... 8

*Rieth-Riley Constr. Co. v. NLRB*
  114 F.4th 519 (6th Cir. 2024) ........................................................................ 10

*San Diego Building Trades Council v. Garmon*
  359 U.S. 236 (1959) .......................................................................................... 5

*Seila Law LLC v. Consumer Fin. Prot. Bureau*
  591 U.S. 197 (2020) ...................................................................................... 9, 10

**State Cases**

*Midwest Motor Exp., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &*
  *Helpers of America, Local 120*
  512 N.W.2d 881 (Minn. 1994) ......................................................................... 6

*Westcott v. Mack Molding Co.*
  2024 WL 5176835 (Vt. Dec. 20, 2024) ........................................................... 6

**Federal Statutes**

29 U.S.C. § 151 ................................................................................................... 2, 8

29 U.S.C. § 153 ................................................................................................... 8, 9

29 U.S.C. § 153(a) ............................................................................................... 10

29 U.S.C. § 153(d) ............................................................................................... 10

29 U.S.C. § 156 ................................................................................................... 5, 6

29 U.S.C. § 157 ...................................................................................................... 5

29 U.S.C. § 158(a) ................................................................................................. 5

29 U.S.C. § 160 ...................................................................................................... 8

29 U.S.C. § 160(c) .................................................................................................. 8

U.S. Const. art. II, § 3 ......................................................................................... 10

**Federal Regulations**

29 C.F.R. § 101.12 ................................................................................................. 8

**Other Authorities**

*Designing Executive Agencies for Congressional Influence*
   69 Admin. L. Rev. 259 (2017) ......................................................................... 10

Walter Hourahan, *Collective Bargaining, in Historical Encyclopedia of American
   Labor Law* 92, 93 (Robert E. Weir & James P. Hanlan eds., 2004) .......................... 8

*Whole Foods Market Group, Inc.,*
   No. 04-RC-355267 (N.L.R.B. Feb. 3, 2025) ........................................................ 8

Jon O. Shimabukuro & Julie M. Whittaker, Cong. Rsch. Serv., R42526,
   Federal Labor Relations Statutes: An Overview 15 (Sept. 5, 2014) ........................ 2

Laura Feiveson, Labor Unions and the U.S. Economy, U.S. Department of the
   Treasury (Aug. 28, 2023) ................................................................................. 3

## INTEREST OF AMICI CURIAE[1]

For 90 years the National Labor Relations Act ("NLRA" or "the Act") has supported workers and strengthened the American economy by enabling employees to join together to negotiate for higher wages, better health and retirement benefits, and improved working conditions. The National Labor Relations Board ("NLRB" or "the Board") is the independent federal agency charged with administering and enforcing the NLRA and thus plays an integral part in safeguarding the ability of everyday Americans to advance their workplace interests through collective action. Defendants' unlawful removal of Plaintiff Wilcox from the Board not only immediately prevents the Board from performing several of its most important functions but also contravenes the law and customs intended to preserve the Board's independence and legitimacy in the long term.

*Amici* States of Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont and Wisconsin have a unique interest in a fully functional and independent NLRB. Many *Amici* States have a higher percentage of employees covered by collective bargaining agreements than the national average and all have a strong interest in having a well-

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *Amici Curiae* or their counsel made a monetary contribution to the preparation or submission of this brief.

functioning labor relations system.[2]  And, because the NLRA vests the Board with significant oversight authority, the absence of a functioning Board creates a regulatory vacuum that harms workers in *Amici* States. *Amici* thus have a strong interest in ensuring that federal labor laws remain effective.

## ARGUMENT

### I.    LABOR UNIONS SUPPORT AMERICAN WORKERS AND THE ECONOMY.

In passing the NLRA, Congress explicitly recognized that the "inequality of bargaining power" between employees and employers "substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries." 29 U.S.C. § 151. Since one of Congress's "primary objective[s]" in enacting the NLRA was "[t]o achieve stability of labor relations," *Colgate-Palmolive-Peet Co. v. N. L. R. B.*, 338 U.S. 355, 362 (1949), the NLRA "grants certain rights to both workers and employers, seeks to prevent practices that could frustrate a peaceful worker-employer relationship, and provides mechanisms for workers and employers to resolve disputes." Jon O. Shimabukuro &

---

[2] In 2024, for example, 27.5% percent of wage and salary workers in Hawai'i, 21.9% of those in New York, and 14.8% of those in Minnesota were covered by a union or employee association agreement (regardless of whether they were members of the collective bargaining unit), *see* Bureau of Labor Statistics, *Union Affiliation of Employed Wage and Salary Workers by State*, https://www.bls.gov/news.release/union2.t05.htm (Jan. 28, 2025), compared with 11.1 percent nationwide, *see* Bureau of Labor Statistics, *Union Affiliation of Employed Wage and Salary Workers By Selected Characteristics*, https://www.bls.gov/news.release/union2.t01.htm (Jan. 25, 2025).

Julie M. Whittaker, Cong. Rsch. Serv., R42526, *Federal Labor Relations Statutes: An Overview* 15 (Sept. 5, 2014) (emphasis added), https://crsreports.congress.gov/product/pdf/R/R42526. As Section II will discuss in greater detail, the NLRB is the linchpin of the dispute-resolution system the NLRA established.

Unionization and collective bargaining have been central to improving the economies of *Amici* States and the welfare of their workforces. Empirical evidence shows that unionized workers earn higher wages than their non-unionized counterparts. According to the Treasury Department, union members make approximately 10-15 precent more than their non-member peers, with larger wage benefits for longer-tenured union workers.[3] This "union wage premium" is particularly high among Hispanic workers, Black workers, and women.[4]

Further, union workers are offered more non-wage benefits compared to non-members, including better retirement benefits, health and life insurance, and paid leave.[5] Indeed, more than 90 percent of union workers are offered sick leave in contrast to 77 percent of non-union workers.[6] Although employer-provided childcare is still uncommon in the United States, employers of union workers are about

---

[3] Laura Feiveson, *Labor Unions and the U.S. Economy*, U.S. Department of the Treasury (Aug. 28, 2023), https://home.treasury.gov/news/featured-stories/labor-unions-and-the-us-economy.

[4] U.S. Department of the Treasury, *Labor Unions and the Middle Class,* 13 (August 2023), https://home.treasury.gov/system/files/136/Labor-Unions-And-The-Middle-Class.pdf.

[5] Feiveson, *supra* note 3.

[6] U.S. Department of the Treasury*, supra* note 4, at 16-17.

25 percent more likely to offer a childcare benefit than employers of non-union workers.[7] And unions have a notable impact on personnel practices that improve the quality of workers' lives: unionized workplaces have better systems for addressing employee grievances, stronger protections for more senior employees, and better workplace safety practices.[8]

Moreover, unions also help set industry standards that benefit both union and non-union workers. When unionized workplaces establish higher wages and better working conditions, non-union employers may follow suit to remain competitive in the labor market.[9] For instance, increases in private-sector union membership are correlated with increased non-union wages.[10]

Because the labor relations machinery created by the NLRA relies on the NLRB to function effectively, any action incapacitating the Board also threatens all the benefits that the Act confers.

## II.    STATES NEED AN EFFECTIVE NLRB TO REGULATE LABOR RELATIONS AND ADJUDICATE LABOR DISPUTES.

Because of the scope of authority granted in the NLRA to the Board, *Amici* States stand to suffer if the NLRB is unable to perform its statutorily mandated rulemaking and adjudicatory functions.

---

[7] *Id*. at 17.

[8] *Id*. at 18.

[9] *Id*. at 19.

[10] Feiveson, *supra* note 3.

Although the precise boundaries are uncertain, the NLRA grants the Board broad authority over the conduct of labor relations and preempts States from regulating that conduct. The Supreme Court has stated that, subject to certain exceptions, the Board maintains exclusive oversight over conduct that is even "arguably protected or prohibited" by the Act. *Amalgamated Ass'n of St., Elec. Ry. And Motor Coach Emp. Of America v. Lockridge*, 403 U.S. 274, 276 (1971) (citing *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959)); *see also Glacier Northwest, Inc. v. Int'l Brotherhood of Teamsters Local Union No. 174*, 598 U.S. 771, 776 (2023) (noting that *Garmon* preemption "goes beyond the usual preemption rule").

In particular, the *Garmon* Court held that "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." *Garmon*, 359 U.S. at 245. Those sections, which the Board is empowered to advance through its rulemaking authority, *see* 29 U.S.C. § 156, contain the heart of the NLRA's protections for workers. For instance, Section 7 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. § 157. And Section 8 prohibits employers from engaging in a host of unfair labor practices, including threatening workers for engaging in union activity or refusing to bargain with union representatives. *See* 29 U.S.C. § 158(a). The principle

5

articulated in *Garmon* has often prevented states, including state courts, from regulating certain core labor issues that are within the exclusive province of the NLRB's rulemaking authority. *See, e.g., Westcott v. Mack Molding Co.,* No. 24-AP-132, 2024 WL 5176835, at *6 (Vt. Dec. 20, 2024) (noting that "an employee who believes his rights to record under the NLRA are being infringed may avail himself of the NLRB's exclusive jurisdiction over claims for violations of the NLRA"); *Midwest Motor Exp., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 120*, 512 N.W.2d 881, 887 (Minn. 1994) (holding that a "case that involves an unfair labor practice falls under the exclusive jurisdiction of the NLRB").[11]

Despite the Board's explicit rulemaking authority, *see* 29 U.S.C. § 156, it primarily implements the Act by adjudicating labor disputes. The "Board, uniquely among major federal administrative agencies, has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking." *Allentown Mack Sales & Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998).

The NLRB's adjudication process is robust and similarly preempts state adjudication of many labor disputes, at least in the ordinary course of events. *See Chaulk Services, Inc. v. Massachusetts Comm'n Against Discrimination*, 70 F.3d 1361, 1370 (1st Cir. 1995) (noting "NLRB's role as chief arbiter of labor disputes" and declining to adjudicate state claims where there was risk of "creating a system of

---

[11] Of course, absent a functioning National Labor Relations Board, there might arise a serious question whether the Board's exclusive authority would have preemptive effect on state regulatory authority over labor matters.

labor dispute adjudication parallel to the NLRB"). Employees, unions, and employers file 20,000 to 30,000 unfair labor practice charges each year.[12] Indeed, there are currently over 260 unfair labor practice cases pending in Minnesota alone.[13] To handle this immense caseload, the NLRB has delegated aspects of the adjudication process to Regional Directors and Administrative Law Judges ("ALJ") but retains responsibility for reviewing their determinations on appeal.[14] Regional Directors investigate initial charges and determine if they have sufficient merit for an ALJ to conduct a hearing, review evidence, and render a decision.[15] Parties can then appeal an ALJ decision to the Board.[16] The Board reviews hundreds of cases every year, including 144 unfair labor practice cases and 115 cases involving elections and questions of representation in 2024 alone.[17] And over the last decade, the Board has issued decisions in nearly 3,000 cases in total.[18] The absence of a functioning Board would allow unfair labor practices to remain unchecked, to the detriment of *Amici* States.

---

[12] *See Investigate Charges*, Nat'l Lab. Rel. Bd., https://www.nlrb.gov/about-nlrb/what-we-do/investigate-charges (last visited Feb. 24, 2025).

[13] *See Case Search*, Nat'l Lab. Rel. Bd., https://www.nlrb.gov/search/case?f[0]=case_type:C&s[0]=Open&s[1]=Open%20-%20Blocked&state[0]=MN (last visited Feb. 24, 2025).

[14] *See The NLRB Process*, Nat'l Lab. Rel. Bd., https://www.nlrb.gov/resources/nlrb-process (last visited Feb. 24, 2025).

[15] *Id.*

[16] *Id.*

[17] *Board Decisions Issued*, Nat'l Lab. Rel. Bd., https://www.nlrb.gov/reports/agency-performance/board-decisions-issued (last visited Feb. 24, 2025).

[18] *Id.*

### III.    INVALIDATING THE NLRA'S REMOVAL PROTECTION WOULD NEEDLESSLY DESTABILIZE LABOR LAW.

Defendants' unlawful removal of Plaintiff in the middle of her term undermines the Board's ability to function effectively as an independent, impartial, quasi-judicial body.

By depriving the Board of a quorum, Plaintiff's dismissal will effectively nullify the NLRA's protections for the foreseeable future. Parties cannot sue to enforce the Act in federal or state court; instead, unfair-practice complaints must begin before the agency. *See* 29 U.S.C. § 160; *Glacier Nw.*, 598 U.S. at 776-77. And the Board cannot act without a quorum of at least three members, *see* 29 U.S.C. § 153; *see also New Process Steel, L.P. v. N.L.R.B.*, 560 U.S. 674, 680 (2010), which Plaintiff's dismissal renders unavailable.[19] Defendants' unlawful removal of Plaintiff will thus undermine the Act's protections, depriving workers, employers, and States of the benefits discussed above and likely generating "industrial strife and unrest." 29 U.S.C. § 151; *see, e.g.*, Walter Hourahan, *Collective Bargaining*, *in Historical Encyclopedia of American Labor Law* 92, 93 (Robert E. Weir & James P. Hanlan eds., 2004) (crediting NLRA with increasing "stability" of labor-management relations).

Indeed, parties have already cited the lack of a quorum in challenging administrative proceedings under the NLRA. Mere days after Defendants unlawfully removed Plaintiff from the Board, Whole Foods asserted in a filing that a designated

---

[19] Although many NLRA administrative proceedings are heard by ALJs in the first instance, an ALJ's decision can become final without Board action only if no party appeals. *See* 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. Thus, any party that allegedly violated the Act can attempt to forestall final agency action for as long as the Board lacks a quorum by appealing any adverse ALJ decision.

Regional Director lacked statutory authority to certify the results of an election at one of its stores because of the absence of a quorum at the NLRB.[20]

Plaintiff's unlawful dismissal affects not only the current enforcement of labor laws, but also the long-term stability and legitimacy of the NLRB as a multi-member agency made up of experts. By limiting the permissible grounds for removal and giving Board members staggered five-year terms, *see* 29 U.S.C. § 153, Congress intended to create a stable body of labor law through an agency that would "accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020) (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 624 (1935)).[21] Those provisions also reflect Congress's intent that the Board be "'non-partisan' and . . . 'act with entire impartiality'" in adjudicating cases, *id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624), a goal further advanced by the Board's tradition of partisan balance, *see* Brian D. Feinstein, *Designing Executive Agencies for Congressional Influence*,

---

[20] *See* Whole Foods Market Group, Inc.'s Objections to Conduct Affecting the Results of Election, *Whole Foods Market Group, Inc.*, No. 04-RC-355267 (N.L.R.B. Feb. 3, 2025).

[21] The amicus brief filed by Tennessee takes issue with lawful regulations promulgated by the NLRB and other executive branch agencies during a period when Democrats led the executive branch. *See* Tenn. Br. 2, 12-14. The brief claims that states are being "whipsaw[ed]" by federal rules that are not "check[ed]" by Congress or Presidents. *Id.* at 3. But it is Congress that established the carefully staggered terms of the NLRB and it is past Presidents that have exercised their authority to appoint the chair and fill empty positions. Allowing each President to replace the entire Board each administration would pose a much larger risk of "whipsaw[ing]" states with ever-changing regulation and adjudication.

69 Admin. L. Rev. 259, 279 n.77 (2017). Defendants' position would defeat these congressional purposes.

Fortunately, Article II does not require that result because, as Plaintiff's brief explains, the statutory removal protection for NLRB members is constitutional. That result makes good sense, since the Act leaves the President ample means to fulfill his constitutional obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Seila Law*, 591 U.S. at 213. The President appoints the Board's members, designates its chairperson, and may remove members for cause. *See* 29 U.S.C. § 153(a). He also appoints—and may remove at will—the agency's general counsel. *See id.* § 153(d); *Rieth-Riley Constr. Co. v. NLRB*, 114 F.4th 519, 529-31 (6th Cir. 2024). The NLRA gives "final authority . . . in respect of the investigation of charges and issuance of complaints" to the at-will-removable general counsel. 29 U.S.C. § 153(d). This separate office, and the President's appointment and removal power over it, demonstrates that the Board has less expansive independent powers than those wielded by the 1935 FTC, the agency whose members' removal protection the Court upheld in *Humphrey's Executor*. While the FTC had "wide powers of investigation" and the ability to "issue . . . complaint[s]," *Humphrey's Ex'r*, 295 U.S. at 620-21, the NLRA gives "final authority . . . in respect of the investigation of charges and issuance of complaints" to the at-will-removable general counsel, 29 U.S.C. § 153(d).

## CONCLUSION

The NLRB plays a central role in adjudicating and regulating labor relations in our nation. Its stability, impartiality, and expertise are key to the wellbeing of

workers in every state. *Amici* urge this Court to consider those public interest factors as weighing heavily in favor of granting Plaintiff's motion for expedited summary judgment.

Dated: February 28, 2025                    Respectfully submitted,

 

KEITH ELLISON
Attorney General
State of Minnesota

_____
LIZ KRAMER
Solicitor General
ZACH BIESANZ*
Assistant Attorney General

Office of the Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Kramer)
(651) 757-1257 (Biesanz)
liz.kramer@ag.state.mn.us
zach.biesanz@ag.state.mn.us

*Admitted to the bar of this Court

(Additional Counsel Listed on Following Page)

11

KRISTIN K. MAYES
*Attorney General*
*State of Arizona*
2005 N. Central Ave.
Phoenix, AZ 85004

ROB BONTA
*Attorney General*
*State of California*
1515 Clay Street
Oakland, CA 94612

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State Of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 Sixth Street, NW
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place, 20th Floor
Boston, MA 02108

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 12224

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

12

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
17 W. Main Street
Madison, WI 53703

## CERTIFICATE OF COMPLIANCE

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the

requirements of LCvR 5.4, complies with the requirements set forth in Fed. R. App.

P. 29(a)(4), and does not exceed 25 pages in length.


Dated: February 28, 2025

14

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the original of

this brief with the Clerk of the Court using the CM/ECF system. Notice of this filing

will be sent to all attorneys of record by operation of the Court's electronic filing

system.


Dated: February 28, 2025